## UNITED STATES v. CHANDLER.
### Cr. No. 17667.

District Court, D. Massachusetts.
April 28, 1947.

See also 7 F.R.D. 365.

George F. Garrity, U. S. Atty., and Gerald John McCarthy, Asst. U. S. Atty., both of Boston, Mass., Oscar R. Ewing, Sp. Asst., to the Atty. Gen., Theron L. Caudle, Asst. Atty. Gen., Clyde E. Gooch and Tom DeWolfe, Sp. Assts. to the Atty. Gen., and Samuel C. Ely and Victor C. Woerheide, Sp. Attys., both of Washington, D. C., for plaintiff.

Claude B. Cross and Edward C. Park, both of Boston, Mass., for defendant.

FORD, District Judge.

The defendant moves to dismiss the indictment and bases his motion on five grounds which will be discussed in the order they are set out in the motion.

The indictment consists of a single count and in substance charges that the defendant, owing allegiance to the United States, committed 23 overt acts at various places in Germany in furtherance of his treasonable adherence to that country or its agents.

I. "The indictment improperly joins in one count several charges for separate and distinct acts and is, therefore, duplicitous".

It is true, as defendant argues, an indictment is duplicitous which joins two or more distinct and separate offenses in the same count, but this rule does not preclude the charge in the same count of several acts relating to the same transaction and together constituting only one offense or one connected charge or transaction, (27 Am.Jr. Sec. 124, p. 684). Where a series of acts are charged as having been committed in pursuance of a unitary offense, it is not duplicity to include the separate acts in the same count. Ford v. United States, 273 U.S. 593, 602, 47 S.Ct. 531, 71 L.Ed. 793.

The defendant does not challenge the accuracy of what has already been said, as he states in his brief: "It is true that a count in an indictment is not duplicitous merely because it charges several related acts, all of which enter into and constitute a single offense, though each of such acts may in itself constitute an offense", citing, among other cases, Andersen v. United States, 170 U.S. 481, 500, 18 S.Ct. 689, 42 L.Ed. 1116; Crain v. United States, 162 U.S. 625, 636, 16 S.Ct. 952, 40 L.Ed. 1097. What he does challenge is the contention of the government that it has charged "a single treasonous enterprise". Defendant contends the acts charged were not sufficiently related in time and space to constitute a single offense. Admittedly the crime of treason consists of the two essential elements: adherence to the enemy and giving aid and comfort. The overt

act in manifestation of the treasonable intent is not an essential element of the crime of treason. Defendant in his brief agrees that an adherence to the enemy may be continuous. The government in the present indictment alleges it was continuous between the actual dates. The overt acts reflect the fact that the acts were related to the same enterprise, i. e., activities for the German Radio Broadcasting Company. The fact that they were spread over a period of more than three years does not belie the fact the defendant was engaged in a single enterprise with the German Short Wave Radio Station.

■ The conclusion seems warranted that the indictment charges a unitary offense of treason beginning December 11, 1941 and continuing up to and including May 8, 1945. That being so, for the reasons set forth, the indictment is not duplicitous. Cf. United States v. Haupt, 7 Cir., 136 F.2d 661, 665, and 7 Cir., 152 F.2d 771, 793.

II. "The indictment does not state facts sufficient to constitute an offense against the United States".

Defendant contends that the Constitutional definition of treason does not comprehend an adherence to the enemy by one residing in enemy country.

■ At the outset it is plain that the Constitutional definition of treason does not expressly place any territorial limitation in respect of the crime of treason. Article III, Section 3. Treasonable acts endanger the sovereignty of the United States. It has never been doubted that Congress has the power to punish an act committed beyond the territorial jurisdiction of the United States which is directly injurious to the government of the United States. United States v. Bowman, 260 U.S. 94, 97, 43 S.Ct. 39, 67 L.Ed. 149. It is true as stated in United States v. Rodgers, 150 U.S. 249, 264, 14 S.Ct. 109, 37 L.Ed. 1071, that "as a general principle the criminal laws of a nation do not operate beyond its territorial limits" but, as stated in United States v. Bowman, supra, 260 U.S. at page 97, 43 S.Ct. at page 41, 67 L.Ed. 149: "The necessary locus, when not specifically defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations." This court believes Congress did define the locus of the crime of treason without violating in any manner the Constitutional definition of treason. Section 1 of the Criminal Code, 18 U.S.C.A. § 1, reads as follows: "Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason." This statute, if given a natural meaning, seems directed at the crime of treason wherever the treasonable acts are committed, whether territorially or extra-territorially. If we assume, as defendant argues, that the section contains no qualification as to the locale of the adherence and the addition of the words "within the United States or elsewhere" define the locality only of "giving them aid and comfort", this is not sufficient basis for an implication that the framers intended that adherence must be within the United States. Under the defendant's theory, the Congressional definition was declaratory of the Constitutional intent and in employing the words "or elsewhere" it contemplated giving of aid and comfort outside the United States by a traitor residing within the country. This theory violates the plain language of the statute. Moreover, any physical distinction between "adhering" and "giving of aid and comfort" seems tenuous indeed, in view of an opinion popular among delegates to the Constitutional Convention that the latter phrase was merely explanatory of the former, and the resolution of the Committee of the Whole that the latter phrase be inserted as restrictive of the former. See Hurst, Treason in the United States, 58 H.L.R. 395, 402.

■ As external evidence of the framers' intent, defendant cites the resolution, on June 24, 1776, of the Continental Congress, drawn by men who later helped in writing the Constitution, which comprehended treasons within the colonies only. 5 Journals of the Continental Congress (1906) 475.

The defendant also cites the English statute which has been the source for our enactments, 25 Edw. III, which he contends did

not apply to foreign treasons at the time of the adoption of the Constitution. (It should be noted, however, that many of the authorities cited in Rex v. Casement, 1917 Law Reports 1, King's Bench Division 98, which affirmed a conviction for a foreign treason, antedate the adoption of the Constitution). The defendant argues that the fathers had the same limitation in mind; and, if not, Article III, Section 3 is more extensive than the English Treason Act which they considered too extensive. The answer is that if they had intended to restrict the crime to local treasons, they would have adopted a definition which included a limitation similar to 25 Edw. III. The delegates to the Constitutional Convention had every opportunity to do so. They had as models the resolution of the Continental Congress and the treason acts passed by a majority of the colonies. One of their most illuminating debates on the treason clause revolved about a definition proposed by Gouverneur Morris and Randolph which stated: "* * * that if a man do levy war agst. the U. S. *within their territories,* or be adherent to the enemies of the U. S. *within the said territories,* giving them aid and comfort *within their territories or elsewhere,* * * * he shall be adjudged guilty of Treason." (Italics mine.) See Hurst, op. cit. supra, 58 H.L.R., at 399–402. The conclusion seems imperative that the italicized words were omitted deliberately from the final draft, and with a purpose to encompass foreign treasons.

This interpretation finds support in the writings of Thomas Jefferson who, though himself not a delegate to the Constitutional Convention, participated in drafting both the treason act recommended by the Continental Congress and the Virginia treason statute of October, 1776. Regarding a section on treason to be submitted to the Virginia legislature, he bracketed the words "within the same" following, "* * * or be adherent to the enemies of the Commonwealth", and appended the following footnote: "These words in the English statute narrow its operation. A man adhering to the enemies of the Commonwealth, *in a foreign country,* would certainly not be guilty of treason with us, if these words be retained. The convictions of treason of that kind in England have been under that branch of the statute which makes the compassing the king's death treason. Foster 196, 197. But as we omit that branch, we must by other means reach this flagrant case." (Emphasis supplied) See Hurst, op. cit. supra, 58 H.L.R. at 252–3. Professor Hurst's comment follows: "Plainly, in 1778 he [Jefferson] favored a general policy of limiting the scope of the offense. On the other hand, like the draftsmen of the Federal Constitution, he wished the law to give firm protection to the state within the area embraced by the definition: hence his extended definition of 'adhering to the enemy' ". Thus the view that the Constitutional definition may be in at least one respect more extensive than that in the English Act seems not at all repugnant.

■ The defendant further contends, citing the case of The Venus, 8 Cranch 253, 3 L.Ed. 553, that the defendant's residence in Germany and engaging in his customary work did not in any event constitute the crime of treason. It is perfectly plain that this contention involves many factual aspects and can hardly be disposed of in a motion to dismiss.

For example, an alien domiciled in a foreign country as the defendant Chandler admittedly was during the periods alleged in the indictment was bound to obey all the laws of the German Reich as long as he remained in it, not immediately relating to citizenship, during his sojourn in it. All strangers are under the protection of a sovereign state while they are within its territory, and owe a local temporary allegiance in return for that protection. Defendant Chandler, while domiciled in the German Reich owed a qualified allegiance to it, he was obligated to obey its laws and he was equally amenable with citizens of that country to the penalties prescribed for their infraction.

■ At the same time a citizen of the United States owes to his government full, complete, and true allegiance. He may renounce and abandon it at any time. This is a natural and an inherent right. When he goes abroad on a visit or for travel, he must, while abroad, obey the laws of the foreign country, where he is temporarily. In this

sense and to this extent only he owes a sort of allegiance to such government, but to no extent and in no sense does this impair or qualify his allegiance or obligations to his own country or to his own government. Ex parte Griffin, D.C., 237 F. 445, 450, 451.

 The last contention by the defendant concerning ground II of the motion to dismiss is that the indictment charges words as acts of treason and words are not acts of aid and comfort to the enemy within the Constitutional definition.

It is true that mere words that are expressions of opinion, printed or written, will not constitute acts of treason (Wimmer v. United States, 6 Cir., 264 F. 11; Hurst, Treason in the United States, 58 H.L.R. pp. 430–444; cf. United States v. Werner, D. C., 247 F. 708), but the government charges something more than mere words or expressions of opinion in this case.

Putting to one side other overt acts, the government in overt acts 10 and 11 and 17–21, inclusive, of the indictment (probably the acts the defendant refers to) does not *merely* charge words as an act of treason. The government in those acts charges the defendant has moved from the realm of mere expressions of opinion into the realm of action. It charges in overt acts 10 and 11 that he prepared texts in Germany for the enemy in English and in 17–21 that he made recordings at the German Short Wave Radio Station in English for subsequent broadcast by the German Short Wave Radio Station to the United States. Activities of the kind charged when the character of the broadcasts and other facts are presented may well constitute acts of treason.

III. "The overt acts alleged in the indictment are insufficient *in law* to establish the offense of treason or any other offense against the United States".

The defendant contends the overt acts alleged as giving aid and comfort to the enemy are trivial and commonplace and would not in any setting warrant a finding by a jury that aid and comfort were actually given to the enemy. Cramer v. United States, 325 U.S. 1, 34, 65 S.Ct. 918, 89 L.Ed. 1441.

We shall assume that some of the overt acts alleged in the indictment have a com-monplace aspect as they are drawn and may finally have that aspect after all the evidence of the setting or environment of these acts is presented. This was the case in Cramer v. United States, supra, with respect to the overt acts 1 and 2. As the court pointed out 325 U.S. at page 37, 65 S.Ct. at page 936, 89 L.Ed. 1441 of that case: "There is no two-witness proof of what they said nor in what language they conversed. There is no showing that Cramer gave them any information whatever of value to their mission or indeed that he had any to give. No effort at secrecy is shown, for they met in public places. Cramer furnished them no shelter, nothing that can be called sustenance or supplies, and there is no evidence that he gave them encouragement or counsel, or even paid for their drinks." The Court intimated evidence of the kind it found lacking might very well have given a different complexion to the overt acts under discussion.

There is a group of overt acts charged by the government as giving actual aid and comfort that do not appear to have too commonplace an aspect. Overt acts 10 and 11 and 17–21, inclusive, charging that the defendant recorded talks for subsequent broadcasts to the United States by the German Short Wave Radio Station may, I do not at this point say they do, if proved, warrant a finding that aid and comfort was actually given to the enemy. In view of the allegations of these acts the court would not be warranted in dismissing the indictment as a whole for the lack of legal sufficiency of some of the others, even if the court believed certain of the other acts were legally insufficient.

 I think the better practice in a treason case is not to pass upon the legal sufficiency of an overt act until all the evidence is presented except in a case where the evidence could not possibly add anything to what appeared plainly to be an untreasonable act.

 Rule 12(b) (4) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. following section 687, I believe provides for this procedure. Determination of a motion to dismiss may be deferred until a trial of

the general issue. The court will not at this stage of the case pass upon the legal sufficiency of the overt acts but will defer determination of this important aspect of the case until trial.

IV. "The overt acts alleged in the indictment are manifestly merely preparatory parts of acts not treasonable unless completed and not set forth in the indictment, and the indictment does not, therefore, contain a definite written statement of the essential facts constituting the offense charged."

 It seems apparent from the defendant's brief that this ground repeats that relied on as the third ground to dismiss the indictment. The defendant argues that the overt acts could not be found by a jury to constitute aid and comfort to the enemy. What the court has stated above with respect to the third ground relied on need not be repeated. Until all the evidence is adduced, the court will not put itself in the position of passing upon the legal sufficiency requirement that the overt act as proved could be found by the jury to give aid and comfort to the enemy. It may be that some of the overt acts alleged cannot be submitted to the jury as possible acts of treason as was the case with acts 1 and 2 in the Cramer case, but for the reason stated above the court will decide that matter at the trial. This court is thoroughly aware of what the function of the overt act is in treason cases. As Mr. Jackson states in the Cramer case: "The very minimum function that an overt act must perform in a treason prosecution is that it show sufficient action by the accused, *in its setting*, to sustain a finding that the accused *actually* gave aid and comfort to the enemy." (325 U.S. at page 34, 65 S.Ct. at page 934, 89 L.Ed. 1441. (Emphasis supplied.)

V. "The Court is without jurisdiction because Congress has not by law directed the place of trial of crimes committed within the territorial jurisdiction of a foreign government".

 The indictment alleges the treasonable acts were committed in Germany and Austria and the defendant was first brought from Germany into the District of Massachusetts.

The defendant contends that Section 41 of the Judicial Code, 28 U.S.C.A. § 102, applies only to crimes committed on the high seas and that the court has no jurisdiction in this case, despite the section's unambiguous language as follows: "The trial of all offenses committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district where the offender is found, or into which he is first brought."

The defendant at the outset contends that the heading of Section 41, as it appears at 28 U.S.C.A. § 102, viz., "Offenses on the high seas", supports his position. A slightly, but significantly, different heading appears in the original bill, found at 36 Stat. 1099, 1100, viz., "Offenses on the high seas, *etc.,* where triable." (Emphasis supplied.)

The defendant cites Ex parte Bollman, 4 Cranch 75, 2 L.Ed. 554; United States v. Alberty, 24 Fed.Cas. No. 14426, and United States v. Chapman, D.C., 14 F.2d 312, and argues these cases are authority for his contention that the phrase "elsewhere out of the jurisdiction of any particular State or district" does not include places on land within the jurisdiction either of the United States or of foreign powers. It is the opinion of this court that these cases do not stand for the proposition defendant asserts. In all these cases, the conclusion that the court did not have jurisdiction was fundamentally based upon the fact that the offenses were committed in a district of the United States and a tribunal existed in that district where the offenses could be tried. That is not the case here.

In a dictum in the case of United States v. Bowman, supra, the Supreme Court construed Section 41 of the Judicial Code as applying to crimes committed in foreign lands. Indeed it would be inconceivable to reach a conclusion, especially in view of the plain language of Section 41 of the Judicial Code, that no court in the United States had jurisdiction of the crime of treason committed in a foreign land.

Ordered that the motion to dismiss the indictment be denied for the reasons set out above.

### Inquiry into Sanity of Defendant.

The defendant Douglas Chandler was indicted for the crime of treason on December 30, 1946, in the District Court of the United States, District of Massachusetts.

Upon a request made January 20, 1947 by the defendant for the appointment of counsel, the court on the same day appointed Edward C. Park and Claude B. Cross counsel for the defendant.

On February 12, 1947 counsel for the defendant filed a "Motion for an Inquiry into Sanity" of the defendant supported by two affidavits: (1) by Dr. Kenneth J. Tillotson, chief psychiatrist at McLean Hospital, Belmont, Massachusetts, and (2) by Claude B. Cross, of counsel, in substance that the defendant did not possess the capacity to understand the nature of the charges against him and to aid rationally in the conduct of his defense to the charge. There was a request that the court appoint experts to inquire into the present sanity of the defendant.

On February 24, 1947 this court entered an order directing that a hearing be held to determine the present sanity of the defendant. After hearing counsel for the government and defendant, the court appointed, under the provisions of Rule 28, Federal Rules of Criminal Procedure, Dr. A. Warren Stearns, Dr. Clarence A. Bonner, and Dr. Norris B. Flanagan, all psychiatrists, as expert witnesses to inquire into the present mental capacity of the defendant to understand the nature and object of the proceedings against him, to comprehend his own condition in reference to such proceedings, and to aid rationally in the preparation and prosecution of his defense.

On February 27, 1947 an order was entered directing the Marshal of this district to transfer the defendant to the United States Public Health Service Marine Hospital and retain jurisdiction over him at that institution for the purpose of the mental examination. The defendant was examined at the Marine hospital by the psychiatrists appointed by the court, by Dr. Abraham Myerson, a psychiatrist, on behalf of the government, and by Dr. Frederick Wyatt, a psychologist, on behalf of the defendant.

In a report dated April 2, 1947 and submitted to the court, Drs. A. Warren Stearns, Clarence A. Bonner, and Norris B. Flanagan stated that in their opinion the defendant "is not now insane nor feebleminded. He has the mental capacity to understand the nature and object of the proceedings against him; to comprehend his own condition in reference to such proceedings; and to act rationally in the prosecution of his defense."

On April 16, 17, 18, 21, and 22, 1947, this court held a hearing to determine the present sanity of the defendant and the questions whether the defendant has now the mental capacity to understand the nature and object of the proceedings pending against him, to comprehend his condition in reference to these proceedings, and to aid rationally in the preparation and prosecution of his defense. All the experts for both parties, mentioned above, testified at considerable length. One lay witness was offered by the defense, an Edward V. Sittler, of Wolfrateshausen, Bavaria, Germany, a native of the United States, a naturalized citizen of Germany since 1941, and employed as a translator through World War II in the offices of the U. S. A. Zone of the German Radio. Voluminous documents, all of which had been presented to the experts before the hearing purporting to bear on the mental condition of the defendant, were introduced at the hearing. Among these were reports of Army psychiatrists who had conducted a neuro-psychiatric examination of the defendant in Germany on September 5, 1946 and found him then sane; an extensive statement by Chandler made to a special agent of the Bureau of Investigation December 21, 1942; letters of defendant written during his confinement in the Marine hospital to his sister and niece; letters purported to be written by the defendant while in Italy to his then counsel in the United States and the State Department; memoranda by defendant to his counsel, at latter's request, concerning examination of defendant by

Dr. Abraham Myerson at the Marine hospital.

Dr. Kenneth J. Tillotson, defendant's expert psychiatrist, based his opinion that the defendant was not a proper person to be put upon his trial upon the fact that at present he is a true paranoiac. Drs. Stearns, Bonner, Flanagan, and Myerson concluded the defendant is not a true paranoiac, that he has the mental capacity to understand the nature and object of the proceedings against him, to comprehend his own condition in reference to such proceedings, and to aid rationally in the preparation and prosecution of his defense. Also, as has been stated, the three Army neuro-psychiatrists concluded, in September 1946, that the defendant Chandler was sane and responsible at that time.

It is apparent that the weight of the medical testimony is overwhelmingly against the defendant. Also Dr. Tillotson did not convince the court that the defendant was a true paranoiac, that his persecutory beliefs with respect to the Jews were personal, or came from internal causes or were self-created, a necessary concomitant, as I understand the experts, of true paranoia. This court has reached the conclusion the defendant's beliefs were not created wholly by himself but were shared by a great many people who are anti-Jewish. It was very apparent that the defendant had absorbed many of his anti-Jewish beliefs from outside reading and alleged business experiences of himself and his wife with Jews, and, having adopted an anti-Jewish attitude, it was not too difficult for him to reach the conclusion, in all probability shared by other persons who preached the doctrine that international Jewry was the universal poisoner of all nations (see Hitler's last political testament in The Last Days of Hitler, by H. R. Trevor-Roper),

that the Jews would do harm to him and others of similar beliefs.

Apart from the expert testimony, it is proper for the court in deciding the issue involved in a hearing of this kind to consider the conduct of the defendant in court. From this observation I have no hesitancy in finding that the defendant knows full well the crime with which he is charged and his relation to it. Two particular documents introduced in evidence that had considerable weight in convincing this court that he could rationally aid in the preparation of his defense were the memorandum given to his counsel at the latter's request of the examination of him conducted by the government expert, Dr. Myerson, and the statement made to the agent of the Federal Bureau of Investigation. These indicated to me that the defendant was perfectly competent to furnish his counsel with any facts or information necessary to a preparation of his case.

It is apparent in this memorandum that I have not attempted to discuss in detail the extended and highly technical testimony of the experts; there is little need for such a discussion. The fact is that the expert testimony, the evidence presented by the documentary evidence and the defendant's behavior in the court room, have compelled this court to conclude there is no reasonable doubt that the defendant is sane and a proper person to put upon his trial for the offense charged in the indictment.

In conclusion, I find that the defendant, Chandler, has the capacity to understand the nature and object of the proceedings against him, to comprehend his condition in reference to such proceedings, and to aid rationally in the preparation and prosecution of his defense.