## PEOPLE v HARDESTY

Docket No. 57810. Submitted May 2, 1984, at Lansing.—Decided November 19, 1984. Leave to appeal applied for.

William E. Hardesty was found to be guilty but mentally ill following a jury trial in Washtenaw Circuit Court on four counts of first-degree murder, one count of second-degree murder, and two counts of assault with intent to murder and was sentenced, Ross W. Campbell, J. Defendant appeals. *Held:*

1. The fact that the trial court initially gave an incorrect jury instruction on legal sanity did not result in prejudice to defendant since the trial court subsequently corrected the mistake prior to jury deliberation.

2. The trial court did not abuse its discretion in refusing to allow defendant's expert witness, a clinical psychologist, to render an opinion as to defendant's sanity at the time of the offenses. The witness had an overall lack of experience and education in evaluating the sanity of an accused.

3. Defendant was not denied his rights against cruel and

REFERENCES FOR POINTS IN HEADNOTES

[1] 21 Am Jur 2d, Criminal Law § 57 *et seq.*

Modern status of test of criminal responsibility—state cases, 9 ALR4th 526.

[2] 21 Am Jur 2d, Criminal Law § 76.

29 Am Jur 2d, Evidence § 158.

Modern status of rules as to burden and sufficiency of proof of mental irresponsibility in criminal case. 17 ALR3d 146.

[3] 75 Am Jur 2d, Trial §§ 628, 920-922.

[4] 5 Am Jur 2d, Appeal and Error §§ 603, 604, 737, 884.

31 Am Jur 2d, Expert and Opinion Evidence § 7.

[5-9] 21 Am Jur 2d, Criminal Law § 95.

[6, 7, 9] 21 Am Jur 2d, Criminal Law § 99.

Propriety of criminal trial of one under influence of drugs or intoxicants at time of trial. 83 ALR2d 1067.

[9] 29 Am Jur 2d, Evidence § 436.

Admissibility of videotape film in evidence in criminal trial. 60 ALR3d 333.

Admissibility in evidence of sound recording as affected by hearsay and best evidence rule. 58 ALR3d 598.

Admissibility of sound recordings in evidence. 58 ALR2d 1024.

unusual punishment, to be present at trial, to confront witnesses against him, and to freedom of thought by virtue of the fact that he was made competent to stand trial through the use of psychotropic drugs.

4. Defendant's right to testify in his own behalf was not violated by virtue of the fact that he was kept on psychotropic drugs during his testimony. Informing the jury of defendant's drugged condition adequately protected his right to testify.

5. Sufficient evidence was presented by the prosecution to survive defendant's motion for a directed verdict as to the first-degree murder counts involving defendant's parents.

6. An instruction on a guilty but mentally ill verdict did not deprive defendant of his right to a fair trial by encouraging jury compromise.

7. The jury's finding that defendant was mentally ill at the time of the offenses was not inconsistent with the finding of malice, premeditation, or specific intent.

Affirmed.

S. D. BORMAN, J., concurred but wrote separately to suggest that a defendant pleading insanity might be allowed to present video tape depositions of testimony given by him prior to trial in a drug-free condition in order to present probative evidence of his insanity through his manner and demeanor on the witness stand and to preserve his right to be tried while mentally competent while, at the same time, recognizing the state's interest in courtroom safety and order. She found no error in the present case since defendant was not in a drug-free condition at the time he committed the crimes and because the testimony he gave at his trial revealed a picture of a severely disturbed individual even while under the influence of psychotropic drugs.

## OPINION OF THE COURT

1. CRIMINAL LAW — DEFENSES — INSANITY — LEGAL SANITY.
    A defendant is legally sane if he has substantial capacity both to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law.

2. CRIMINAL LAW — DEFENSES — INSANITY — BURDEN OF PROOF.
    The prosecution, once any evidence of a defendant's insanity is introduced in a criminal proceeding, has the burden of proving the defendant's sanity beyond a reasonable doubt.

3. CRIMINAL LAW — JURY INSTRUCTIONS — PRESUMPTIONS.
    The rule that it must be presumed that a jury followed the

incorrect instruction where both correct and incorrect versions of an instruction are rendered need not be extended to cases where the trial court expressly repudiates the incorrect instruction.

4. APPEAL — EVIDENCE — EXPERT TESTIMONY.

The Court of Appeals reviews a trial court's admission, exclusion, or limitation of expert testimony for abuse of discretion.

5. CRIMINAL LAW — CONSTITUTIONAL LAW — DUE PROCESS — COMPETENCE TO STAND TRIAL.

The conviction of an accused while he is incompetent to stand trial violates due process (US Const, Ams V, XIV; Const 1963, art 1, § 17).

6. CRIMINAL LAW — COMPETENCE TO STAND TRIAL — MEDICATION.

An accused may be adjudicated competent to stand trial even if competency is obtained or ensured through medicinal agents and may be tried even though medication must be continued throughout trial to prevent the accused from again becoming incompetent (MCL 330.2020[2]; MSA 14.800[1020][2]).

7. CRIMINAL LAW — INSANITY — COMPETENCE TO STAND TRIAL — MEDICATION.

There is no per se rule that a drug-normalized accused must be allowed to discontinue medicinal treatment so that the jury may observe his demeanor in a drug-free state, even though a substantial probability exists that the accused may thereby become incompetent at trial; the proper test is to balance, on a case-by-case basis, the state's interests in safety and trial continuity with the defendant's interest in presenting probative evidence of insanity through his manner and demeanor on the witness stand.

8. CRIMINAL LAW — INSANITY.

A defendant's demeanor on the witness stand is probative of the issue of sanity only to the extent that the defendant's mental state at trial approximates his mental state at the time of the offense.

CONCURRENCE BY S. D. BORMAN, J.

9. CRIMINAL LAW — INSANITY — VIDEO TAPE DEPOSITIONS.

*A practical alternative to allowing a defendant who pleads insanity to testify at trial free of the effects of antipsychotic drugs which rendered him competent to stand trial is to allow him to present a video tape deposition of testimony given by him prior to trial in a drug-free state; this would allow the defendant to*

*present probative evidence of his insanity through his manner
and demeanor on the witness stand while preserving his right
to be tried while mentally competent and, at the same time,
recognizing the state's interest in courtroom safety and order.*

*Frank J. Kelley,* Attorney General, *Louis J.
Caruso,* Solicitor General, *William F. Delhey,* Prosecuting Attorney, and *David A. King,* Assistant
Prosecuting Attorney, for the people.

State Appellate Defender (by *P. E. Bennett),* for
defendant on appeal.

Before: SHEPHERD, P.J., and CYNAR and S. D.
BORMAN,* JJ.

CYNAR, J. A jury found defendant to be guilty of
four counts of first-degree murder, MCL 750.316;
MSA 28.548, one count of second-degree murder,
MCL 750.317; MSA 28.549, and two counts of
assault with intent to murder, MCL 750.83; MSA
28.278, but mentally ill. He was sentenced to life
terms for the five murders, and terms of 100 to
200 years and 150 to 300 years on the assaults.
Defendant filed an appeal as of right alleging
seven grounds for reversal.

The charged offenses occurred at three different
locations in Wayne and Washtenaw Counties during the night of October 18-19, 1978. On the evening of October 18, defendant shot and killed his
parents, Ronald and Jeannette Hardesty, at their
home in rural Wayne County. Later that night, he
shot and killed Troy Curry and Timothy Schofield
outside Abigail's Bar in Ypsilanti. The same night,
he went to Stiles-Wood Building, a machine shop
in Ypsilanti Township, Washtenaw County, and
shot and killed Daniel Wood, the brother of his
former wife. He also shot Tommy Lee Brown, a

---

* Circuit judge, sitting on the Court of Appeals by assignment.

witness to the Wood killing. He later returned to
the machine shop and shot Bobby Joe Baker as he
fled after discovering the dead and wounded men
at the machine shop. Defendant was arrested at
his home on the morning of October 19, 1978.

On November 8, 1978, defendant was admitted
to the Center for Forensic Psychiatry in Ypsilanti
for a competency evaluation. After two Forensic
Center examiners testified that defendant was not
competent to stand trial but might eventually be
rendered competent, the trial judge found defen-
dant incompetent and committed him to the De-
partment of Mental Health for treatment.

In March, 1979, a competency hearing was again
held and defendant was found competent to stand
trial. However, on June 15, 1979, the judge, on his
own motion, found reason to believe defendant
again might not be competent. He ordered that
defendant be returned to the Forensic Center for
another evaluation, and at the next hearing he
was again found incompetent. Defendant was re-
committed to the Forensic Center.

In August, 1980, Dr. Lee of the Forensic Center
staff recommended that defendant be found compe-
tent to stand trial. During his commitment, defen-
dant was given psychotherapy and drug therapy,
receiving injections of Prolixin (fluphenazine deca-
noate), an antipsychotic medication and major
tranquilizer. Dr. Lee strongly recommended that
Hardesty be continued on this chemotherapy while
awaiting trial. The judge found defendant compe-
tent to stand trial by an order dated September 11,
1980. He ordered that defendant's treatment not
be changed without consultation with Dr. Lee.

On January 30, 1981, just prior to the trial
herein, the judge heard several motions, including
a motion seeking to discontinue use of psycho-
tropic drugs in defendant's treatment program.

Defense counsel argued that this would give the jury a truer picture of defendant's mental condition when he took the stand. The motion was denied without prejudice.

Defense counsel also argued prior to trial that the evidence was insufficient to support the prosecutor's charges of first-degree murder in the killings of defendant's parents. The trial judge denied defendant's motion for a directed verdict on this issue, and defendant went to trial on these charges. After the prosecutor's case in chief, defendant again moved for a directed verdict on this issue, which the trial court again denied.

The trial commenced on February 13, 1981, and continued through 11 days of proceedings, until the case went to the jury on the evening of March 4, 1981. The prosecutor's case-in-chief included the testimony of 35 witnesses. Following the denial of defendant's motion for a directed verdict of dismissal with respect to the first-degree murder charges in the killings of Ronald and Jeannette Hardesty, the defendant presented nine witnesses, including defendant, in support of defendant's insanity defense. The judge refused to allow defendant's clinician at the Forensic Center to testify as an expert on his criminal responsibility, but allowed her to testify on his competency for trial.

Among his witnesses, defendant produced three experts who testified that he was insane at the time of the killings. In rebuttal, the prosecutor presented four expert witnesses who had examined defendant and determined that he was not insane and should be found criminally responsible.

The jury deliberated all day on both March 5 and March 6, 1981, ultimately finding defendant guilty as charged but mentally ill on six of the seven counts, and guilty of second-degree murder but mentally ill in the killing of his father.

I

WHETHER DEFENDANT'S CONVICTIONS SHOULD BE REVERSED BECAUSE THE TRIAL JUDGE'S INSTRUCTIONS ON INSANITY WERE INCORRECT AND CONFUSING.

In order to have been insane at the time of the crime, a defendant first must have been mentally ill:

"As used in this chapter, 'mental illness' means a substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." MCL 330.1400a; MSA 14.800(400a).

Then, a defendant must meet a further condition:

"A person is legally insane if, as a result of mental illness * * * that person lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." MCL 768.21a(1); MSA 28.1044(1)(1).

Thus, whether or not he was mentally ill, a defendant is legally *sane* if he had substantial capacity *both* to appreciate the wrongfulness of his conduct *and* to conform his conduct to the requirements of the law. If any evidence of insanity is introduced, the prosecution then bears the burden of establishing the defendant's sanity beyond a reasonable doubt. *People v Murphy,* 416 Mich 453, 463-464; 331 NW2d 152 (1982).

In defense counsel's opening remarks, he stated that the sole issue in the case was defendant's sanity at the time of the shootings. He argued that the prosecution could not prove beyond a reasonable doubt that defendant was not mentally ill and not insane at the time of the offenses. Following

the defense attorney's opening statement, the trial
judge gave instructions on the statutory definitions
of mental illness and insanity. However, near the
end of such instructions, the judge said:

"Correspondingly, a person is legally sane if despite
mental illness that person possesses substantial capac-
ity to appreciate the wrongfulness of his conduct *or* to
conform his conduct to the requirements of the law he
is charged with violating." (Emphasis added.)

Before the jury deliberations began, the judge
again instructed on mental illness and insanity,
repeating the instructions as given before. Defense
counsel did not object to the judge's erroneous
instructions on legal sanity given after his opening
remarks. However, he properly objected to the
instruction prior to the jury deliberations, appar-
ently pointing out that the instruction was incor-
rect because the Michigan Standard Criminal Jury
Instruction 7:8:02A improperly used the article
"or" instead of "and".

This Court in *People v Gasco,* 119 Mich App 143,
145; 326 NW2d 397 (1982), *lv den* 414 Mich 951
(1982), said:

"While the CJI definition of legal insanity correctly
states the law, the CJI definition of legal sanity is
erroneous. The court's instructions on legal sanity allow
the jury to find defendant criminally responsible if it
concluded that: (a) he knew the difference between right
and wrong; *or* (b) he could conform his conduct to the
requirements of the law. In fact, pursuant to MCL
768.21a(1); MSA 28.1044(1)(1), defendant would be le-
gally sane only if both (a) and (b) were true. CJI
7:8:02A, and the trial court, should have used 'and'
instead of 'or' in the definition of legal sanity."

After defense counsel's conference with the
judge, the judge announced that he was going to

amend and correct his previous instruction. Defendant, on appeal, argues that the attempted correction was again wrong because although the judge properly replaced the "or" of the incorrect instruction with an "and", the correction mistakenly replaced "sane" with "insane". After defendant filed his appellate brief, however, the official court reporter filed an affidavit with corrected transcript pages 1550-1554. The affidavit states that the court reporter compared the original transcript with her own notes and the back-up tape recording of the proceedings to correct the transcripts. Corrected page 1551 beginning at line 21 shows that the trial judge properly replaced the "or" with an "and", and properly said "sane" rather than "insane". Nonetheless, defendant argues that where both correct and incorrect versions of an instruction are rendered, it must be presumed that the jury followed the incorrect instruction. *Gasco, supra,* p 145.

This is a worthy rule to be sure, but we decline to extend it to cases where, as here, the trial court expressly repudiates the incorrect instruction. Such a holding would make every inadvertant but substantive instructional error irremediable and hence subject to mistrial, even though the error is brought to the attention of the judge prior to deliberation. We can discern no prejudice to a defendant where instructional mistakes are timely corrected.

## II

WHETHER THE TRIAL JUDGE ABUSED HIS DISCRETION IN REFUSING TO ALLOW DEFENDANT'S EXPERT WITNESS TO GIVE HER OPINION OF DEFENDANT'S CRIMINAL RESPONSIBILITY.

The trial judge refused to allow Joan Schon-

thaler, a clinical psychologist, to render an opinion as to defendant's sanity at the time of the offenses. The judge found that an inadequate foundation had been laid as to her experience in evaluating criminal responsibility.

This Court reviews a trial court's admission, exclusion, or limitation of expert testimony for abuse of discretion. *Patelczyk v Olson,* 95 Mich App 281; 289 NW2d 910 (1980). We will not disturb the court's exercise of discretion in this case. Although Schonthaler's contact with defendant was a consideration, it does not outweigh her overall lack of experience and education in evaluating the sanity of an accused. See *People v Parney,* 74 Mich App 173; 253 NW2d 698 (1977).

### III

WHETHER DEFENDANT WAS DENIED HIS RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT, TO BE PRESENT AT TRIAL, TO CONFRONT WITNESSES AGAINST HIM, AND TO FREEDOM OF THOUGHT BECAUSE HE WAS MADE COMPETENT TO STAND TRIAL ONLY THROUGH THE USE OF PSYCHOTROPIC DRUGS.

This is one of the two issues focusing on the psychopharmaceutical restoration and maintenance of defendant's competence before and during trial. We address these issues in a different order than defendant has raised them, as the proper resolution of the instant issue has implications affecting the issue following.

The conviction of an accused while he is incompetent to stand trial violates due process. US Const, Ams V, XIV; Const 1963, art 1, § 17; *Pate v Robinson,* 383 US 375; 86 S Ct 836; 15 L Ed 2d 815 (1966); *People v Chambers,* 14 Mich App 164, 174; 165 NW2d 430 (1968), *lv den* 381 Mich 802 (1969). Under the Michigan Mental Health Code, an ac-

cused may be adjudicated competent to stand trial even if competency is obtained or ensured through medicinal agents:

"A defendant shall not be determined incompetent to stand trial because psychotropic drugs or other medication have been or are being administered under proper medical direction, and even though without such medication the defendant might be incompetent to stand trial. However, when the defendant is receiving such medication, the court may, prior to making its determination on the issue of incompetence to stand trial, require the filing of a statement by the treating physician that such medication will not adversely affect the defendant's understanding of the proceedings or his ability to assist in his defense." MCL 330.2020(2); MSA 14.800(1020)(2).

As previously noted, defendant was originally found incompetent, then competent, then incompetent again, and finally competent after he was placed on biweekly injections of Prolixin at the Forensic Center. The record indicates a substantial possibility that discontinuance of drug treatments prior to trial would have caused defendant's condition to regress to a state of incompetency.

Defendant maintains that the above statutory provision is unconstitutional, arguing:

"If the prosecution cannot make a person competent to stand trial without forcedly affecting his mind, then the prosecution has no right to try him for a crime. Rather than a trial the state's remedy is to initiate civil commitment proceedings. *Jackson v Indiana* [406 US 715; 92 S Ct 1845; 32 L Ed 2d 435 (1972)].

"The State could only make Mr. Hardesty competent to stand trial through the administration of mind-altering drugs. The State was changing a mentally ill and insane person into a criminal by drugging him. Because Hardesty was involuntarily made competent, his convictions should be reversed."

Defendant rests his argument almost exclusively upon *State v Maryott,* 6 Wash App 96; 492 P2d 239 (1971). In that case the defendant's jailers administered to him a variety of tranquilizing drugs solely for the purpose of controlling his behavior in court. The record indicated that the defendant was dull and listless during trial and that he was unable to assist in his defense. Testimony in the case indicated that the tranquilizers would affect the thought, expression and manner of the person maintained under their influence.

In holding that the defendant's conviction was improperly obtained, the *Maryott* court displayed concern about state action infringing upon an accused's ability to think. See *Palko v Connecticut,* 302 US 319; 58 S Ct 149; 82 L Ed 288 (1937). Such conduct was held to be offensive to the defendant's right to be present and confront witnesses against him; these rights, though not absolute, could not be interfered with absent a demonstrated need. *Illinois v Allen,* 397 US 337; 90 S Ct 1057; 25 L Ed 2d 353 (1970). The *Maryott* court further stated:

"In the instant case, it is difficult to see a legitimate state interest in imposing drugs on a defendant who asks to be free of them. If the motive is to control a possibly obstreperous defendant, two conclusions are suggested, analogously, by the reasoning in *Allen.* First, no control should be imposed until its need has been demonstrated. Second, the control which is imposed should insure an orderly trial with the least interference with a defendant's rights." *Maryott, supra,* p 103.

Neither the reasoning nor the result in *Maryott* compels the conclusion that the state may not try an accused made competent in whole or in part through psychotropic medication. Quoting from *Allen, supra,* the *Maryott* court recognized:

"The safeguards that the constitution accords to

criminal defendants presuppose that government has a sovereign prerogative to put on trial those accused in good faith of violating valid laws. Constitutional power to bring an accused to trial is fundamental to a scheme of "ordered liberty" and prerequisite to social justice and peace." *Maryott, supra,* p 103, citing *Allen, supra.*

In *Maryott* this interest was not served by the involuntary medication of the defendant; the drugs used were not essential to render the defendant competent to stand trial, indeed they tended to seriously erode his ability to assist in his defense. In our case the medication allowed the state to bring defendant to trial so that his culpability and criminal responsibility could be adjudicated. Additionally, the record clearly demonstrates that the drugs used enhanced, rather than diminished, defendant's ability to engage in rational thought and assist counsel at trial. This being the case, the balance of competing interests favors the state:

"The state's substantial interest in bringing to trial defendants accused in good faith and on probable cause of violating its laws—an interest in 'the integrity of its criminal justice system' and therefore at the very core of its police power—would seemingly be counted as sufficiently compelling to outweigh the defendant's interest in avoiding medication which, although highly intrusive, will generally not result in irreversible effects." (Footnotes omitted.) Winick, *Psychotropic Medication and Competence to Stand Trial,* 1977 American Bar Foundation Research Journal 769, 812-813.

Defendant's position, if accepted, would mean that the state would either have to avoid rendering drug therapy to an incompetent accused or else give up its right to try him once competence is restored. We find such a result unacceptable. Psychopharmaceutical restoration of a mentally incompetent accused is now a common and effective

procedure. See Haddox & Pollack, *Psychopharmaceutical Restoration to Present Sanity (Mental Competency to Stand Trial)*, 17 J For Sci, 568, 576 (1972); Buschman & Reed, *Tranquilizers and Competency to Stand Trial*, 54 ABA Journal 284 (1968). Additionally, extrajurisdictional decisions which have pondered this same problem have found no impropriety in the trial of a drug-normalized accused. *State v Stacy*, 556 SW2d 552 (Tenn Crim App, 1977) ("We find nothing offensive in allowing a defendant's competency to stand trial to be induced by the use of tranquilizing medication"); *People v Parsons*, 82 Misc 2d 1090; 371 NYS2d 840 (1975) ("Any other holding would constitute an atavistic repudiation of the advances made in the treatment of the mentally ill during the past two decades"); *State v Hampton*, 253 La 399; 218 So 2d 311 (1969) (The state "does not look beyond existing competency and erase improvement produced by medical science"). See also *People v Dalfonso*, 24 Ill App 3d 748; 321 NE2d 379 (1974); *State v Potter*, 285 NC 238; 204 SE2d 649 (1974); *State v Arndt*, 1 Or App 608; 465 P2d 486 (1970); *State v Rand*, 20 Ohio Misc 98; 247 NE2d 342 (1969); *State v Plaisance*, 252 La 212; 210 So 2d 323 (1968), *cert den* 393 US 1005; 89 S Ct 496; 21 L Ed 2d 470 (1968).

We hold that an incompetent accused may be made competent through medicinal agents, and may be tried even though medication must be continued throughout trial to prevent the accused from again becoming incompetent. In so doing, we uphold the constitutionality of MCL 330.2020(2); MSA 14.800(1020)(2).

## IV

WHETHER DEFENDANT'S RIGHT TO TESTIFY IN HIS

own Behalf was Violated Because he was Kept
on Psychotropic Drugs During his Testimony.

Having previously upheld the state's right to try
a drug-normalized defendant, we must now inquire
whether the state may maintain the defendant's
competence at trial through drugs where insanity
is advanced as a defense and the defendant's de-
meanor on the witness stand is an element of his
proofs.

Following the second determination of incompe-
tency to stand trial in October, 1979, defendant
was returned to the Forensic Center, where the
staff began treating him with Prolixin. Prolixin
Decanoate is described in the Physician's Desk
Reference (1984 ed) at p 1934 as "a highly potent
behavior modifier with a markedly extended dura-
tion of effect". It is used in treatment of chronic
schizophrenics, and is about 100 times more potent
than Thorazine. Prolixin blocks or lessens delu-
sions and hallucinations and would not be given
on a regular basis to a person who was not men-
tally ill.

Joan Schonthaler testified that defendant re-
ceived injections once every two weeks. At first Dr.
Lee gave him a dosage of 12.5 milligrams every
two weeks, but he gradually increased the dosage
until it reached 50 milligrams every two weeks.
Defendant improved considerably, and the medica-
tion was reduced to a maintenance dosage of 25
milligrams. The voices defendant claimed to hear
went away and he seemed to be less suspicious of
people and could think more rationally.

Before trial, defendant moved to be taken off
Prolixin. Defense counsel conceded that without
the drug defendant might fall apart, but argued
that the jury would get a truer picture of defen-
dant's mental condition. He contended that, be-
cause defendant's behavior and thinking processes

were being affected by Prolixin, defendant appeared much less psychotic than he really had been at the time of the shootings. The trial judge denied the motion without prejudice, telling defense counsel that he wanted a factual foundation from a medical officer at the Forensic Center that withdrawing defendant from medication would not cause him to regress and again become incompetent to stand trial.

Apparently, defense counsel never renewed this motion before or during trial. Defendant took the stand in his own behalf.

Defendant contends that requiring him to appear at trial in a sedated condition was an abridgment of his fundamental constitutional and statutory right to testify in his own behalf. MCL 600.2159; MSA 27A.2159; US Const, Ams V, VI, XIV, Const 1963, art 1, § 17, 20; *Guilty Plea Cases,* 395 Mich 96, 120; 235 NW2d 132 (1975). It is argued that, in attempting to preserve defendant's rights to be present and competent at his trial, the court traded away defendant's right to present a defense and to testify in his own behalf, because the jury could not properly evaluate the extent of defendant's mental illness and insanity. Defendant urges that if his mind had not been under the control of psychotropic drugs when he testified, the jury might have found not only that he was mentally ill, but that he was insane.

The Mental Health Code permits the trial court to keep the defendant on medication in order to maintain his competence:

"If the defendant is receiving medication and is not determined incompetent to stand trial, the court may, in order to maintain the competence of the defendant to stand trial, make such orders as it deems appropriate for the continued administration of such medication

pending and during trial." MCL 330.2030(4); MSA 14.800(1030)(4).

Defendant has not cited, nor have we discovered, any Michigan authority on the subject of the conflict between this statute and a defendant's right to testify at his trial in a drug-free condition.

It has long been recognized, in this and other jurisdictions, that the demeanor in court of one who has raised the issue of his sanity is of probative value to the trier of fact. *United States v Chandler,* 72 F Supp 230 (D Mass, 1947); 4 Wigmore, Evidence, § 1160 (3d ed, 1940); *Beaubien v Cicotte,* 12 Mich 459 (1864). Indeed, in *People v Van Diver,* 79 Mich App 539; 261 NW2d 78 (1977), the defendant's demeanor, coupled with the content of his testimony, was sufficient to make the issue of his sanity a jury question even though he was the sole defense witness.

The prosecutor suggests that this issue may not have been preserved adequately for appellate review, since defendant failed to renew his motion after it was denied without prejudice. However, a review of the motion hearing suggests that the trial court desired a showing that defendant would not regress and again become incompetent if withdrawn from drugs. Because defendant's argument suggests that the possibility of reversion to incompetence would not be a legitimate consideration, we will review the issue.

In *State v Maryott, supra,* the defendant's demeanor was also a consideration. In reversing his conviction, the Court noted that, despite his highly excitable condition, "the jury saw him as very quiet because he was drugged". The *Maryott* court stated:

"When mental competence is at issue, the right to

offer testimony involves more than mere verbalization. The demeanor in court of one who has raised the issue of his sanity is of probative value to the trier of fact.

* * *

"In the instant case, * * * the demeanor and attitude of the defendant are of particular significance. If the state may administer tranquilizers to a defendant who objects, the state then is, in effect, permitted to determine what the jury will see or not see of the defendant's case by medically altering the attitude, appearance and demeanor of the defendant, when they are relevant to the jury's consideration of his mental condition." *Maryott, supra,* pp 101-102.

The court concluded that it would not:

"* * * allow the state to erase, by drugs they have administered, the major contours of the demeanor, appearance, and attitude of a defendant who is pleading his mental condition and then explain to the jury what they have, in effect, chosen for the jurors not to see." *Maryott, supra,* p 102.

While *Maryott* is persuasive on the weight to be accorded a defendant's right to testify in a drug-free state where insanity is an issue, it must be remembered that in that case the state had advanced no legitimate competing interest in maintaining the defendant on drugs. A more compelling case for defendant is *Commonwealth v Louraine,* 390 Mass 28; 453 NE2d 437 (1983). In *Louraine* the defendant had a history of hallucinations, had been committed to mental hospitals, had a history of ingesting drugs, had acted in a strange and violent fashion on several occasions, and had attempted suicide several times. There was no evidence that the defendant was taking any antipsychotic medication at the time of the homicide. Prior to his competency hearing, the defendant was placed on heavy amounts of the antipsychotic

drugs Prolixin, Thorazine, Mellaril and Trilafon. The defendant's pretrial motion, that if he were found competent he should be permitted to attend trial in an unmedicated condition, was denied. The judge found that the defendant would not be competent to stand trial if he did not receive medication. The judge reasoned that the defendant could properly present an insanity defense by having expert witnesses bring the effects of the medication to the jury's attention. However, no such testimony was presented at trial. The Massachusetts Supreme Court reversed his conviction, citing *Maryott* and saying:

"In a case where an insanity defense is raised, the jury are likely to assess the weight of the various pieces of evidence before them with reference to the defendant's demeanor. Further, if the defendant appears calm and controlled at trial, the jury may well discount any testimony that the defendant lacked, at the time of the crime, substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. * * * This tendency may render also valueless the defendant's right to testify on his own behalf * * *.

"The ability to present expert testimony describing the effect of medication on the defendant is not an adequate substitute. At best, such testimony would serve only to mitigate the unfair prejudice which may accrue to the defendant as a consequence of his controlled outward appearance. It cannot compensate for the positive value to the defendant's case of his own demeanor in an unmedicated condition." 390 Mass —; 453 NE2d 442.

The Massachusetts Supreme Court went on to discuss several cases in other jurisdictions that supported reversal:

"In *State v Hayes, supra* 118 NH at 462, 389 A2d

1379, the court held that the defendant could be compelled to take medication only 'if the jury is instructed about the facts relating to the defendant's use of medication and if at some time during the trial, assuming the defendant so requests, the jury views him without medication for as long as he is found to have been without it at the time of the crime.' In *In re Pray,* [133 Vt 253; 336 A2d 174 (1975)], the court reversed the conviction where the State had administered the drugs to the defendant without fully disclosing to the defendant or his counsel what effect they had on the defendant. Chief Justice Barney, writing for the Vermont Supreme Court, stated that '[a]t the very least, [the jury] should have been informed that he was under heavy, sedative medication, that his behavior in their presence was strongly conditioned by drugs administered to him at the direction of the State, and that his defense of insanity was to be applied to a basic behavior pattern that was not the one they were observing. In fact, it may well have been necessary, in view of the critical nature of the issue, to expose the jury to the undrugged, unsedated Gary Pray, at least, insofar as safety and trial progress might permit.' *Id.* 133 Vt at 257-258, 336 A2d 174. These cases support the result we reach here." 390 Mass —; 453 NE2d 443-444.

In a footnote the *Louraine* court said:

"We note that we are not deciding today whether the Commonwealth may administer medication to criminal defendants involuntarily to ensure their competence to stand trial." 390 Mass —; 453 NE2d 444 fn 13.

But because the court did not dispute the trial judge's findings that the defendant would not be competent without the drugs, the *Louraine* court implicitly held that such a right, if it existed, would be subordinated to the defendant's right to have his demeanor scrutinized in a drug-free state. Oddly enough, the language from *Pray, supra,* cited in *Louraine,* hints that the balance should be

drawn the other way. Again, the *Pray* court said that when demeanor was critical, it might be necessary to expose the jury to the unsedated defendant "at least, insofar as safety and trial progress might permit".

In *State v Jojola,* 89 NM 489; 553 P2d 1296 (1976), the court reached a result contrary to that in *Louraine.* There the defendant was competent to stand trial only as long as he was maintained on Thorazine. The *Jojola* court rejected the defendant's argument that he had a per se right to be tried free of drugs, distinguishing *Maryott* on the grounds that there was no evidence that the defendant's thought processes were affected by the Thorazine. The defendant also argued that his right to due process was violated, as his demeanor on the witness stand was relevant to his defense. The court ruled that the defendant was not denied due process, since he had been given the opportunity at trial to inform the jury as to the fact of the medication and its affects.

Similarly, in *Ake v State,* 663 P2d 1 (Okla, 1983), *cert gtd Ake v Oklahoma,* — US —; 104 S Ct 1591; 80 L Ed 2d 123 (1984), where the defendant argued that because of the effect of Thorazine he was not actually present at his trial, the court held that, since the jury was apprised of the fact that the defendant was being maintained on drugs, there was no error.

In our case, there is no claim that the drugs administered to defendant rendered him *incompetent.* Compare *Maryott, supra; Peters v State,* 516 P2d 1372 (Okla Crim App, 1973). Defendant was not reduced to a near catatonic state as were the defendants in *Maryott* and *Ake;* indeed, he was an active and beneficial witness in his own behalf. We are concerned only with the effect of the drugs on defendant's demeanor.

We decline to adopt a per se rule that a drug-normalized accused must be allowed to discontinue medicinal treatment so that the jury may observe his demeanor in a drug-free state, even though a substantial probability exists that the accused may thereby become incompetent at trial. We believe the proper test is to balance the state's interests in safety and trial continuity, *Pray, supra,* with the defendant's interest in presenting probative evidence of insanity through his manner and demeanor on the witness stand, the issue being resolved on a case-by-case basis. Compare *State v Murphy,* 56 Wash 2d 761; 355 P2d 323 (1960). Under the facts of this case, we resolve the question in favor of the state and find no reversible error. A defendant's demeanor on the witness stand is probative of the issue of sanity only to the extent that the defendant's mental state at trial approximates his mental state at the time of the offense. Compare *State v Hayes,* 118 NH 458; 389 A2d 1379 (1978) ("The defendant would not be entitled to have the jury view him in a state as free from the effects of medication as he would be after seven days, unless there is evidence that he was in such a state at the time of the crime"). In our case, defendant had received a considerable amount of treatment in the 2-1/2 years from the time of the shootings until the time of trial, and had lapsed in and out of mental competency several times. Proofs taken below also revealed that defendant had ingested a considerable quantity of Valium at the time the crimes were committed. Under these circumstances, the probative value of defendant's demeanor at trial was attenuated. As in *Jojola* and *Ake,* the jury was apprised of the fact and effect of defendant's medication. Since it was a matter of speculation how nearly defendant in an undrugged state at trial would reflect his

mental state at the time of the offenses, we believe that informing the jury of his drugged condition adequately protected his right to testify.

V

Defendant's Remaining Issues.

The last three issues raised by defendant do not require extended discussion.

Our review of the record convinces us that sufficient evidence was presented by the prosecution to survive a motion for a directed verdict as to the first-degree murder counts involving defendant's parents. *People v Hampton,* 407 Mich 354; 285 NW2d 284 (1979). Premeditation and deliberation could be inferred not merely from the characteristics of the slayings, but from defendant's words and actions prior to and subsequent to the deaths of Ronald and Jeannette Hardesty.

Defendant's next contention, that the guilty but mentally ill verdict deprived him of his right to a fair trial by encouraging jury compromise, has been previously considered and rejected by this Court. *People v Delaughter,* 124 Mich App 356; 335 NW2d 37 (1983); *People v Thomas,* 96 Mich App 210; 292 NW2d 523 (1980).[1]

Finally, the jury's finding that defendant was mentally ill at the time of the offenses was not inconsistent with the finding of malice, premeditation, or specific intent. *People v Broadnax,* 111 Mich App 46, 52-53; 314 NW2d 522 (1981), *lv den* 412 Mich 936 (1982). See also *People v Hamm,* 120 Mich App 388; 328 NW2d 51 (1982), *lv den* 417 Mich 1016 (1983).

---

[1] The entire issue of the constitutionality of the guilty but mentally ill verdict is presently on appeal in the Supreme Court and defendant will be free to take appropriate steps after that issue has been resolved. See *People v Bruce Ramsey,* 89 Mich App 468; 280 NW2d 565 (1979), *lv gtd* 414 Mich 864 (1982).

Affirmed.

SHEPHERD, P.J., concurred.

S. D. BORMAN *(concurring)*. I concur. Appellant's argument that he should have been allowed to testify free of the effects of the antipsychotic drugs which rendered him competent is a very compelling one. A practical alternative may lie in allowing the defendant to present a video tape deposition of testimony given by him prior to trial in a drug-free state. In this way, the defendant could present probative evidence of his insanity through his manner and demeanor on the witness stand. This would preserve his right to be tried while mentally competent and, at the same time, recognize the state's interest in courtroom safety and order.

I find no error in the case at bar however because the evidence revealed that defendant was not, in fact, in a drug-free state at the time the crimes were committed. Moreover, the testimony he gave at his trial revealed a picture of a severely disturbed individual even while under the influence of psychotropic drugs.

I agree that this issue will have to be resolved on a case-by-case basis.