**Eugene Nate WOODLAND, Plaintiff,**

v.

**Norman ANGUS, Executive Director, Utah State Department of Social Services, Paul Thorpe, Director, Division of Mental Health, Robert Verville, Superintendent, Utah State Hospital, Craig Hummel, M.D., Clinical Director, Utah State Hospital, Phil Washburn, M.D., Utah State Hospital, Defendants.**

No. 91–CV–1100W.

United States District Court, D. Utah, C.D.

March 15, 1993.

Mary A. Rudolph, Salt Lake City, UT, for plaintiff.

Linda Luinstra, Jody K. Burnett, Bruce H. Jensen, Reed M. Stringham, Salt Lake City, UT, for defendants.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This matter is before the court on plaintiff Eugene Nate Woodland's ("plaintiff") Motion for Summary Judgment and defendants Norman Angus, Paul Thorpe, Robert Verville, Craig Hummel and Phil Washburn's ("defendants") Cross Motion for Summary Judgment. Hearings on both motions were held on May 6, 1992 and January 6, 1993. Woodland was represented by Mary A. Rudolph. Defendants were represented by Jody K. Burnett, Bruce H. Jensen, and Linda Luinstra. Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties. Since taking the matter under advisement, the court has further considered the law and facts relating to both motions. Now being fully advised, the court renders the following Memorandum Decision and Order.

## I. BACKGROUND [1]

Plaintiff is charged with second degree murder in the Third District Court in and for Salt Lake County, Utah. In these proceedings, on December 20, 1990, the Honorable Leonard H. Russon determined that plaintiff was incompetent to stand trial and ordered the plaintiff committed to the Utah State Hospital ("State Hospital"). Plaintiff has been a patient at the State Hospital since that time. Judge Russon also determined that plaintiff was incompetent to give an informed consent or refuse medical treatment and ordered the State Hospital to provide any treatment or medication it deemed necessary. Dr. Philip Washburn, plaintiff's attending physician and the Clinical Director of the State Hospital's Forensic Unit, diag-

nosed plaintiff as suffering from a bipolar disorder, hypomanic state, dementia, suspected to be secondary to alcoholism, and alcohol dependency. It is and was Dr. Washburn's opinion that plaintiff should be treated with medications for these behaviors. Plaintiff has consistently refused to take any such medications.

Beginning on March 13, 1991, a series of hearings on the issue of plaintiff's forced medication were held before the Honorable Anne M. Stirba in the Third District Court in and for Salt Lake County, Utah. Prior to these hearings, plaintiff had not been forcibly medicated. After considering the matter, Judge Stirba ordered the State Hospital to develop policies and procedures for the involuntary medication of patients consistent with the substantive and procedural due process requirements set forth in *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). In accordance with Judge Stirba's order, the State Hospital formulated a policy and set of procedures for forcibly medicating patients ("Original Section 11"). Under the Original Section 11, a patient could be medicated against his will if (1) the patient suffered from a mental illness; (2) the patient posed a threat of serious harm to himself, others, or their property; and (3) the treatment was in the patient's medical interest. Pursuant to this section, on September 5, 1991, the State Hospital held a hearing in an attempt to forcibly medicate plaintiff. The three-person administrative review committee that reviewed plaintiff's case refused to approve the forcible medication, however, because it found that plaintiff did not pose a threat of serious harm to himself, others, or their property.

A few months later, during September and October, the State Hospital revised and rewrote the policy and procedures for the involuntary medication of patients ("Revised Section 11"). The Revised Section 11 is substantially similar to the Original Section 11

---

**1.** The facts in this case are not disputed; rather, the parties have agreed to submit the case to the court on cross motions for summary judgment. *See* Bruce H. Jensen's Letter to the Court of March 20, 1992. In their Memorandum in Support of Defendants' Motion for Summary Judgment and In Opposition to Plaintiff's Motion for

Summary Judgment, defendants "admit numbered paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 12, 13 and 14 of plaintiff's Statement of Undisputed Facts." *Id.* at 5. Defendants do not dispute the facts contained in paragraphs 9, 10, and 11, but rather the "characterizations" of the facts contained in those paragraphs. *Id.*

with one exception: to forcibly medicate a patient under the Revised Section 11 the patient need not be dangerous to himself, others, or their property.[2] Instead, the treatment need only be found in the plaintiff's medical best interest and in accordance with prevailing standards of medical practice.

On October 16, 1991, the State Hospital informed plaintiff of the new policy and that a new hearing to determine whether he should be forcibly medicated would be held the next day. Freed of the need to find plaintiff a danger to himself or others, the committee approved the involuntary medication of plaintiff under the Revised Section 11. Pursuant to the new policy, plaintiff appealed the committee's decision to the State Hospital's Medical Staff President. The President upheld the committee's decision, however, and on October 18, 1991, the State Hospital began to forcibly medicate plaintiff with serentil, an antipsychotic medication, and lithium carbonate, a mood stabilizer.

On October 22, 1991, plaintiff filed this civil rights action claiming that the Revised Section 11 violated the First and Fourteenth Amendments to the United States Constitution. As defendants the plaintiff named Norman Angus, Executive Director of the Utah State Department of Social Services, Paul Thorpe, Director of the Division of Mental Health, Robert Verville, Superintendent of the State Hospital, Craig Hummel, M.D., Clinical Director of the State Hospital, and Phil Washburn, M.D., an employee of the State Hospital. On November 11, 1991, plaintiff sought this court's order for a preliminary injunction prohibiting the defendants from continuing to forcibly medicate plaintiff. After briefing and a hearing, the court granted the motion and ordered defendants to cease medicating plaintiff until the matter could be resolved at a hearing on the merits. Thereafter, on February 14, 1992, plaintiff filed a Motion for Summary Judgment, and defendants filed their Cross Motion for Summary Judgment on March 27, 1992. The parties briefed the issues and a

hearing was held on May 6, 1992. At that hearing, the court determined that resolution of the motions for summary judgment required the court to decide whether plaintiff is competent to render an informed consent regarding the administration of the medication, and ordered the parties to submit supplemental evidence on this issue. Defendants filed the affidavit of Dr. Noel C. Gardner on June 5, 1992, and plaintiff filed the affidavit of Dr. Mark Rindflesh on December 3, 1992. A second hearing was held on January 6, 1993, at which the court heard testimony from Drs. Gardner and Rindflesh, and accepted the proffered testimony of Dr. Hummel. Having carefully reviewed and considered the entire file in this case, including the materials filed regarding the motion for a preliminary injunction, the court grants plaintiff's Motion for Summary Judgment and denies defendants Cross Motion for Summary Judgment.

## II. STANDARD OF REVIEW

■ Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir.1991).

■ Once the moving party has carried its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Gonzales v. Millers Casualty Ins. Co.*, 923 F.2d 1417,

---

**2.** The parties disagree as to whether Judge Stirba's order required the State Hospital to include a finding of dangerousness as a prerequisite to

the administration of forcible medication. The court's resolution of other issues obviates the need to resolve this disagreement.

1419 (10th Cir.1991).[3] The non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

■ In considering whether there exists a genuine issue of material fact, the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991).[4] Finally, all material facts asserted by the moving party shall be deemed admitted unless specifically controverted by the opposing party. D.Utah R. 202(b)(4).

## III. COMPETENCE TO RENDER AN INFORMED MEDICAL CONSENT

The first issue before the court is plaintiff's competence to refuse to participate in the treatment approved by the State Hospital under Revised Section 11. In his Order Declaring Defendant Incompetent and Order of Commitment of December 20, 1990, Judge Russon committed the plaintiff to the State Hospital pursuant to Utah Code Ann. § 77–15–6(1). *See* Order of December 20, 1990 by the Honorable Leonard H. Russon, Case No. 901901148FS ("Judge Russon's Order"). Under section 77–15–6(1), "the court shall order [a person found incompetent to proceed to trial] committed to the Utah State

Hospital." Utah Code Ann. § 77–15–6(1) (Supp.1992); *see also Id.* § 77–15–1 (1990) ("No person who is incompetent to proceed shall be tried . . . ."). Judge Russon also found plaintiff "incompetent to give an informed consent to treatment and [ ] not competent to refuse treatment." Judge Russon's Order.

■ Plaintiff objected to Judge Russon's Order, and on March 28, 1991, the Honorable Anne M. Stirba "vacate[d] that portion of the Court's previous order requiring [plaintiff] to be forcibly medicated." Order of March 28, 1991 by the Honorable Anne M. Stirba, Case No. 901901148FS ("Judge Stirba's Order"). Therefore, plaintiff's competence to render an informed medical decision has not been adjudicated by the state courts.[5]

■ The court is guided in its evaluation of plaintiff's medical competence by the counsel of four distinguished members of the medical profession: Dr. Noel C. Gardner, M.D., Assistant Clinical Professor of Psychiatry at the University of Utah; Dr. Mark A. Rindflesh, M.D., of the Western Institute of Neuropsychiatry in Salt Lake City; Dr. Craig B. Hummel, M.D., Clinical Director of the Utah State Hospital and a defendant in this case; and Dr. Philip Washburn, M.D., Clinical Director of the State Hospital's Forensic Unit and a defendant in this case. The court also has benefited from the memoranda and other materials provided by the parties. Having carefully considered this information, and having heard the testimony of Drs. Gardner and Rindflesh at the hearing on January 6, 1993, the court finds that

---

**3.** The summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553.

**4.** "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512.

**5.** Defendants claim Judge Stirba did not vacate that portion of Judge Russon's Order finding plaintiff medically incompetent. In an abundance of caution based on the significant interests at stake, the court deems it appropriate to consider that issue here.

Whether plaintiff has been found incompetent to stand trial is not dispositive of his medical competence. *See* Freedman, *Competence, Marginal and Otherwise: Concepts and Ethics,* 4 Intern.J. of L. & Psychiatry 53, 56 (1981) ("The test of competency varies from one context to another."); Developments, *Civil Commitment of the Mentally Ill,* 87 Harv.L.Rev. 1190, 1214 (1974) ("Commentators have also noted that only some of the mentally ill are unable to decide intelligently whether or not to seek treatment."). *See generally* Roth, Meisel & Ledz, *Tests of Competency to Consent to Treatment,* 134 Am.J.Psychiatry 279 (1977).

"plaintiff is not competent at the present time ... to understand the nature of his psychiatric problems and mental illness, the nature and purpose of any proposed treatment for his illness, and to make a rational assessment and decision about the possible benefits and risks associated with any proposed treatment." Aff. of Noel C. Gardner, M.D. of June 5, 1992 ("Gardner Aff.") ¶ 17, at 6–7. The reasons for this finding are set forth below.

Dr. Gardner not only conducted an extensive interview and evaluation of the plaintiff on May 29, 1992, but also reviewed "all available materials regarding the plaintiff's clinical course, including the entire chart from the Utah State Hospital in Provo, Utah, ... [and] affidavits and reports of various mental health professionals who have examined the plaintiff at times in the past." Id. ¶ 7, at 3. Based on the evaluation of this material and his own personal interview with the plaintiff, Dr. Gardner concluded that "plaintiff suffers from two psychiatric disorders or mental illnesses: (1) a severe personality disorder with prominent narcissism and schizotypal; and (2) organic dementia secondary to chronic alcoholism." Id. ¶ 9, at 3–4. Aware that other mental health professionals had diagnosed the plaintiff as suffering from a bipolar disorder (hypomanic), Dr. Gardner noted that at the time of his evaluation plaintiff had been off alcohol for over a year, and plaintiff may have "improved somewhat with respect to his organic brain function deterioration." Id. ¶ 11, at 4. "Bipolar disorder (hypomanic) and narcissism have many similar features. Specifically, patients with either disorder exhibit abnormal grandiose thinking and behavior. In a narcissistic personality, this grandiosity is chronic and constant, whereas in bipolar disorder it occurs episodically only during manic or hypomanic cycles." Id. ¶ 10, at 4. Dr. Gardner concluded, however, that no matter which diagnosis is accurate, a trial of psychotropic medication is indicated. Id. ¶¶ 12–13, at 5.[6]

Dr. Rindflesh agreed with Dr. Gardner that plaintiff "has alcohol-related dementia," but unlike Dr. Gardner concluded that plaintiff suffers from "no other mental disability." Aff. of Dr. Mark Rindflesh, M.D. of December 3, 1992 ("Rindflesh Aff.") ¶ 8, at 2. Based on this diagnosis, again contrary to Dr. Gardner, Dr. Rindflesh concluded that the plaintiff is "mentally competent to render a competent decision regarding medical treatment." Id. ¶ 9, at 2.[7]

Notwithstanding the differences among these diagnoses, it is clear that plaintiff suffers from abnormal grandiose thinking and behavior that affect his ability to make a competent medical decision: "the patient's mental illness and grandiose view of himself cause him to deny that he has a problem or that he needs help ... [plaintiff] does not feel that he is mentally ill nor that he needs to be at the State [H]ospital." Gardner Aff. ¶ 16, at 6; accord Rindflesh Aff. ¶ 10, at 2 ("As a result of his grandiose nature, he does exaggerate some of the potential side effects of psychotropic medications."); Hummel Aff. ¶ 15, at 5 ("[I]n the Plaintiff's case, his Dementia could be responsible for his symptoms of Bipolar Disorder such as poor judgment and delusions."). As Dr. Gardner testified, a key feature of both an organic brain syndrome and bipolar disorder "is the patient's inability to understand the nature and extent of his mental illness, the need for treatment, and the benefits and risks of proposed treatment." Gardner Aff. ¶ 15, at 6.[8]

---

6. Dr. Hummel agreed with Dr. Gardner that plaintiff suffers from dementia, but determined that plaintiff suffers from a bipolar disorder (with psychotic features), rather than narcissism. Aff. of Craig B. Hummel, M.D. of March 26, 1992 ("Hummel Aff.") ¶ 18, at 6. Like Dr. Gardner, Dr. Hummel concluded that "[m]edication with a drug in the family of antipsychotic medications ... is the clearly accepted standard of care...." Id. ¶ 19, at 6–7. Indeed, it was this opinion of Dr. Hummel's, in part, that induced the State Hospital's attempt to forcibly medicate plaintiff.

7. Noting the inconsistencies among the various practitioners, Dr. Rindflesh opined that plaintiff's "diagnosis is difficult to confirm because he is the only source of information regarding his history." Letter of Mark Rindflesh, M.D., of December 1, 1992 to the Court at 1 (attached as Exhibit B to the Rindflesh Aff.).

8. The record contains abundant evidence regarding plaintiff's delusions about his treatment. For example, when plaintiff was briefly medicated with psychotropic drugs in October, 1991, he claimed the medication was causing his "teeth to

Having carefully evaluated all of the evidence in the record, the court is convinced, and so finds, that plaintiff is not competent to make an informed medical decision.

## IV. CONSTITUTIONALITY OF REVISED SECTION 11

Having found that plaintiff is not competent to make a medical decision, the court turns to the central question presented by the motions for summary judgment: whether forcible medication of the plaintiff under Revised Section 11 would deprive plaintiff of his constitutional rights. For the reasons expressed herein, the court answers this question in the affirmative, and holds that Revised Section 11 is invalid as applied in this case as violative of plaintiff's right to substantive due process guaranteed by the Fourteenth Amendment to the United States Constitution.

### A. Plaintiff's Liberty Interest in Bodily Integrity

■ That plaintiff has a protected liberty interest against the unwanted administration of psychotropic drugs cannot be questioned. The United States Supreme Court recently stated that " '[n]o right is more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' " *Cruzan v. Missouri Dep't of Health,* 497 U.S. 261, 269, 110 S.Ct. 2841, 2846, 111 L.Ed.2d 224 (1990) (quoting *Union Pac. R. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891)). Justice Louis Brandies rendered perhaps the most eloquent statement of this right: "the right to be left alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed.

944 (1928) (dissenting opinion) (cited with approval in *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977)). This right incorporates both a general "individual interest in avoiding disclosure of personal matters" and an "interest in independence in making certain kinds of important decisions." *Whalen,* 429 U.S. at 599–600, 97 S.Ct. at 876 (Justice Stevens writing for a unanimous Court). That right embraces a "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Washington v. Harper,* 494 U.S. 210, 221–23, 110 S.Ct. 1028, 1036–38, 108 L.Ed.2d 178 (1990); *accord Riggins v. Nevada,* —— U.S. ——, ——, 112 S.Ct. 1810, 1815, 118 L.Ed.2d 479 (1992).[9]

While defendants do not generally deny that plaintiff has such a right, because the parties dispute the contours of that right, it is appropriate to review the evolution of the right to privacy that led to *Harper* and *Riggins.* At common law the touching of one person by another without consent and without legal justification was an actionable battery. *See* W. Keeton, D. Dobbs, R. Keeton, & D. Owens, *Prosser and Keeton on Law of Torts* § 9, at 39–42 (5th ed. 1984). While on the Court of Appeals of New York, Justice Cardozo suitably described the common-law doctrine: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages." *Schloendorff v. Society of New York Hosp.,* 211 N.Y. 125, 105 N.E. 92, 93 (1914). "The logical corollary of the doctrine of informed consent is that the patient generally possesses the right to not consent, that is, to refuse treatment." *Cruzan,* 497 U.S. at 270, 110 S.Ct. at 2847.

Beginning with the landmark decision of *In re Quinlan,* 70 N.J. 10, 355 A.2d 647, *cert. denied sub nom., Garger v. New Jersey,* 429

---

turn to chalk" and the chalk was "being deposited in [his] kidneys and turning them to glass." Hummel Aff. ¶ 23, at 8.

**9.** A liberty interest "may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675

(1983). Some states, such as New York, afford prisoners or detainees greater due process rights than the United States Constitution based on state constitutions or statutes. *E.g., Sheridan v. Debow,* No. 92-Civ-6024(LJF), 1992 WL 320426, at * 2 (S.D.N.Y. Oct. 27, 1992). Plaintiff's liberty interest under the laws of the State of Utah—if such exists—is not before the court.

U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976), courts began to struggle with the contours of the right to refuse treatment in light of advances in medical technology. In that case, Karen Quinlan suffered severe brain damage as a result of anoxia and was diagnosed as being in a persistent vegetative state. Faced with the reality that Karen would spend the rest of her life in this state, Karen's father sought judicial approval to disconnect his daughter's respirator. Holding that the constitutional right of privacy includes a right to refuse treatment, the New Jersey Supreme Court granted Karen's father's request. *Id.* 355 A.2d at 662–64. Recognizing that no right is absolute, however, the court balanced Karen's right against the asserted state interest. Reasoning that the state's interest "weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims," the court held that the state interests had to yield. *Id.* at 664. Significantly, the court held that the "only practical way" to prevent the loss of Karen's right—given her incompetence—was to allow her guardian to decide "whether she would exercise [that right] in these circumstances." *Id.*

Following *Quinlan* most courts have based a right to refuse treatment either solely on the common-law right to informed consent or on both the common-law right and the constitutional right of privacy. *See* L. Tribe, *American Constitutional Law* § 15–11, at 1365 (2d ed. 1988). For example, in *Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417 (1977), the Supreme Judicial Court of Massachusetts relied on both the right of privacy and the doctrine of informed consent in holding that a profoundly retarded man suffering from leukemia could refuse chemotherapy. *Id.* 370 N.E.2d at 424. The court reasoned that a finding that a person is incompetent does not strip that person of all constitutional rights "because the value of human dignity extends to both," and the court adopted a substituted judgment standard whereby a neutral decision-maker would determine what the incompetent individual's decision would be under the circumstances. *Id.* at 427–34; *see also In re Conroy,* 98 N.J. 321, 486 A.2d 1209, 1229–1233 (1985) (holding the

right of self-determination should not be lost merely because an individual is unable to sense a violation of it). The Supreme Court gave this right the protection of the federal courts when in *Cruzan* it held that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." 497 U.S. at 278, 110 S.Ct. at 2851.

Relying on both the common-law doctrine of informed consent and a general right of privacy, prior to 1990 a number of courts had held that an involuntarily committed mental patient's privacy right is sufficiently protected if professional medical judgment is exercised in making the determination to override the patient's refusal to accept medication. *See, e.g., United States v. Charters,* 863 F.2d 302 (4th Cir.1988), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990); *Dautremont v. Broadlawns Hosp.,* 827 F.2d 291 (8th Cir.1987); *Johnson v. Silvers,* 742 F.2d 823 (4th Cir.1984); *Rennie v. Klein,* 720 F.2d 266 (3rd Cir.1983); *Project Release v. Prevost,* 722 F.2d 960 (2nd Cir. 1983); *Stensvad v. Reivitz,* 601 F.Supp. 128 (W.D.Wis.1985); *R.A.J. v. Miller,* 590 F.Supp. 1319 (N.D.Texas 1984); *United States v. Leatherman,* 580 F.Supp. 977 (D.D.C.1983), *appeal dismissed,* 729 F.2d 863 (D.C.Cir.1984) (Table). Each of these courts relied on the Supreme Court's decision in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

In *Youngberg* the Court held that involuntarily committed mental patients possess a protected liberty interest in safe conditions of confinement and freedom from unreasonable bodily restraint, and minimally adequate training to insure these protected rights. *Id.* at 320, 102 S.Ct. at 2460. The Court reasoned that these liberty interests are not absolute, but are subject to the "operational necessities" of the institutional. Therefore, it is necessary to balance the individual's liberty interest with the "demands of an organized society." *Id.* In balancing these interests, the Court noted that its previous cases have "weighed the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." *Id.*

The Court next focused on "the proper standard for determining whether a State adequately has protected the rights of the involuntarily committed mentally retarded." *Id.* at 321, 102 S.Ct. at 2461. The Court concluded that courts must only make certain that professional judgment was exercised in making the treatment decision. *Id.* It is not a court's prerogative to specify which of several professionally acceptable treatment choices should have been made. Rather, a court "must show deference to the judgment exercised by a qualified professional." *Id.* at 322, 102 S.Ct. at 2461. Where the court finds that professional judgment has been exercised, the professional's decision is presumptively valid, to be overruled "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. at 2462. Thus, under *Youngberg* an involuntarily committed mental patient could be restrained to the extent professional judgment deemed necessary to protect safety or to provide training. *Id.* at 324, 102 S.Ct. at 2462.

In *Mills v. Rogers*, 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982), decided the same day as *Youngberg*, the Court addressed the question "whether involuntarily committed mental patients have a constitutional right to refuse treatment with antipsychotic drugs." *Id.* at 293, 102 S.Ct. at 2445. While the Court "assumed" that the Constitution recognizes such a liberty interest, the Court declined to decide the issue because it was uncertain of the extent to which the State of Massachusetts recognized such a liberty interest under state law. *Id.* at 299, 102 S.Ct. at 2448. After the Court granted certiorari in *Mills*, which arose in Massachusetts, the Supreme Judicial Court of Massachusetts decided *In re Roe*, 383 Mass. 415, 421 N.E.2d 40 (1981). In *Roe*, the court held that under the common law of Massachusetts and under the Federal Constitution the liberty interest of a mental patient to refuse treatment with antipsychotic drugs could be overcome only by "an overwhelming State interest." *Id.*, 421 N.E.2d at 51. Significantly, this was so, the *Roe* court held, even if the patient had

been declared incompetent, in which case the individual was entitled to have substituted judgment exercised on his behalf. *Id.* at 51–52.

The issue avoided by the Court in *Mills* reached the Court nine years later in *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). The specific issue before the Court in *Harper* was whether "a judicial hearing is required before the State may treat a mentally ill prisoner with antipsychotic drugs against his will." *Id.* at 213, 110 S.Ct. at 1032. The prisoner in *Harper* had not been declared incompetent to make a medical decision, but was confined to a state prison's special treatment unit that treated serious medical disorders. The inmate refused to take antipsychotic drugs that had been prescribed by a psychiatrist.

A written state administrative policy governed the forcible administration of drugs to a prisoner against his will and included both substantive and procedural components. First, it stated that if a psychiatrist determined that a drug should be administered even without consent, the prisoner could be forcibly medicated only if (1) he suffered from a "mental disorder" and (2) was "gravely disabled" or posed a "likelihood of serious harm" to himself, others, or property. Second, the policy provided that if the inmate refused to take the medication, he was entitled to a hearing before a neutral committee composed of a psychiatrist, a psychologist, and an associate superintendent of the institution. If the committee determined by majority vote that the inmate suffered from a mental disorder and was gravely disabled or dangerous, he could be medicated against his will.

The policy also guaranteed certain procedural rights to the prisoner. It required that the prisoner be given at least twenty-four hours advance notice of the prison's intent to convene an involuntary medication hearing. The prisoner had the right to attend the hearing, to present witnesses and other evidence, to cross-examine staff witnesses, and to the assistance of an advisor who understood the psychiatric issues involved. The committee had to provide the prisoner with a

copy of the hearing minutes, and the prisoner could appeal the committee's decision to the institution's superintendent. The policy also included provisions for judicial review of any decision that a prisoner should be forcibly medicated with an antipsychotic drug.

After the committee found that the prisoner was a danger to others and should be forcibly medicated, the prisoner instituted legal proceedings under 42 U.S.C. § 1983, claiming that the failure to require a judicial hearing before the administration of medication violated the Due Process, Equal Protection, and Free Speech Clauses of the Federal and State Constitutions, as well as state tort law. The Supreme Court of Washington concluded that, consistent with due process, "the State could administer antipsychotic medication to a competent, nonconsenting inmate only if, in a judicial hearing at which the inmate had the full panoply of adversarial procedural protections, the State proved by 'clear, cogent and convincing' evidence that the administration of antipsychotic medication was both necessary and effective for furthering a compelling state interest." *Harper v. State,* 110 Wash.2d 873, 759 P.2d 358, 364–65 (1988), *reversed,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990).

On appeal, the United States Supreme Court began its analysis by recognizing that the prisoner "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." 494 U.S. at 221–22, 110 S.Ct. at 1036.[10] The Court stated, however, that the extent of a prisoner's constitutional right must be defined in the context of his confinement: here, the policy required the state to establish, by a medical finding, that a mental disorder existed that was likely to cause harm if not treated. The policy also required a psychiatrist to prescribe the medication, thus assuring the treatment would be ordered only if it was in the prisoner's medical best interests, given the legitimate needs of his confinement. *Id.* at 215–16, 110 S.Ct. at 1033–34. Given these standards, the policy recognized both the prisoner's medical interest and the state's interest and comported with the demands of the Due Process Clause. *Id.* at 225, 110 S.Ct. at 1038.

The Court held that whether an institutional regulation infringed constitutional rights must be judged under a "reasonableness test," a test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *Id.* at 223–25, 110 S.Ct. at 1037–39. It held there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. *Id.* at 225, 110 S.Ct. at 1038. This lower standard applied, the Court stated, because the state has an obligation to provide prisoners with medical treatment consistent not only with their own medical interests, but also with the needs of the institution, including measures for the prisoners' own safety. *Id.* at 223–24, 110 S.Ct. at 1037–38. The Court noted that the "legitimacy, and the necessity, of considering the State's interests in prison safety and security are well established by our cases." *Id.* at 223, 110 S.Ct. at 1037. Citing *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), the Court held that "the proper standard for

**10.** Six years before the Court's *Harper* decision, the United States Court of Appeals for the Tenth Circuit reached the same conclusion: the Due Process Clause protects an individual's right to refuse the administration of potentially dangerous medication. *Bee v. Greaves,* 744 F.2d 1387, 1392–93 (10th Cir.1984), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985). Citing *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), the *Greaves* court relied on "the teachings of history [and] solid recognition of the basic values that underlie our society" to conclude that "an individual has a constitutionally protected interest in making his own decision whether to accept or reject the administration of potentially dangerous drugs." *Greaves,* 744 F.2d at 1392. Since *Harper,* courts have applied this liberty interest to situations involving both competent and incompetent prison inmates, *Breads v. Moehrle,* 781 F.Supp. 953, 957 (W.D.N.Y.1991) (competent inmate), *Cochran v. Dysart,* 965 F.2d 649, 650 (8th Cir.1992) (incompetent inmate), civilly committed mental hospital patients, *Sheridan v. Debow,* No. 92–Civ–6024(LJF), 1992 WL 320426, at *2 (S.D.N.Y. Oct. 27, 1992), servicemen, *Doe v. Sullivan,* 938 F.2d 1370, 1383 (D.C.Cir.1991), and parolees, *Felce v. Fiedler,* 974 F.2d 1484, 1489 (7th Cir.1992).

determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is "reasonably related to legitimate penological interests." *Harper*, 494 U.S. at 223, 110 S.Ct. at 1037.

Applying this lesser standard than that applied by the Washington Supreme Court, the *Harper* Court held that the Due Process Clause permitted the state "to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id.* at 227, 110 S.Ct. at 1039–40.[11] "Where an inmate's mental disability is the root cause of the threat he poses to the inmate population, the state's interest in decreasing the danger to others necessarily encompasses an interest in providing him with medical treatment for his illness." *Id.* at 225–26, 110 S.Ct. at 1039. The Court characterized the policy at issue as follows:

> It is an accommodation between the inmate's liberty interest in avoiding forced administration of antipsychotic drugs and the State's interests in providing appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others.

*Id.* at 236, 110 S.Ct. at 1044.

The Court's most recent pronouncement in this area came in *Riggins v. Nevada,* —— U.S. ——, 112 S.Ct. 1810, decided less than one year ago on May 18, 1992. In *Riggins* a competent criminal defendant moved to suspend the administration of an antipsychotic drug until after his trial. The defendant claimed that the drugs continued use would deny him a fair trial by preventing him from showing the jurors his true mental state when he offered an insanity defense. The trial court denied the motion and the defendant was convicted of murder and sentenced to death. On appeal following the conviction, the Supreme Court held that the forced administration of antipsychotic medication during the defendant's trial had violated rights guaranteed by the Sixth and Fourteenth Amendments because the trial court had not found that the forcible administration was necessary to accomplish an essential state policy. The Court stressed that forced medication of a pretrial detainee requires an "overriding justification and a determination of medical appropriateness." *Id.* at ——, 112 S.Ct. at 1815. The Court stopped short of prescribing substantive standards for the forcible administration of antipsychotic medication, however, because the trial court had allowed the administration without making any determination of medical necessity; "[n]or did the [trial court's] order indicate a finding that safety considerations or other compelling concerns outweighed Riggins' interest in freedom from unwanted antipsychotic drugs." *Id.* at —— – ——, 112 S.Ct. at 1815–16.

### B. The State's Interest in Forcibly Medicating the Plaintiff

Defendants have asserted three interests that they claim outweigh the plaintiff's liberty interest: (1) "[a]dvancing the chance of rendering plaintiff competent to stand trial, prove his innocence, and regain his liberty;" (2) "[p]ermitting the State to fulfill its obligation in its role as parens patriae for plain-

---

**11.** In resolving the questions before it, the *Harper* Court employed a two-step substance/procedure approach:

> It is axiomatic that procedural protections must be examined in terms of the substantive rights at stake. But identifying the contours of the substantive right remains a task distinct from deciding what procedural protections are necessary to protect that right. "[T]he substantive issue involves a definition of th[e] protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it. The procedural issue concerns the minimum proce-

dures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance." *Id.* at 220, 110 S.Ct. at 1035–36 (quoting *Mills v. Rogers*, 457 U.S. 291, 299, 102 S.Ct. 2442, 2448, 73 L.Ed.2d 16 (1982)). Therefore, before reaching questions of procedural due process, a court first must "determine 'the contours of the substantive right' by defining 'the protected constitutional interest' and the 'conditions under which competing state interests might outweigh it.'" *Felce v. Fiedler*, 974 F.2d 1484, 1488 (7th Cir. 1992). The court's resolution of the substantive due process issues in this case obviates the need to reach issues of procedural due process.

tiff to provide him with the kind of medical treatment which is most appropriate for his condition and in his medical best interest;" and (3) the State's interest in rendering the plaintiff "able to function in the least restrictive environment, hopefully an out-patient setting." Df.s' Mem.Supp. Df.s' M.Summ.J. ("Df.s' Mem.") at 14. The constitutional inquiry, of course, is whether these interests outweigh the plaintiff's liberty interest.

### C. Involuntary Medication to Restore Plaintiff's Competency to Stand Trial

#### 1. Standard of Review

■ The court first must determine the proper standard of constitutional review under which to evaluate the defendants' claim that the State of Utah's interest in trying the plaintiff for murder outweighs his liberty interest in the unwanted administration of psychotropic medication.[12] Citing *Youngberg*, defendants claim the proper standard "is lower than the 'compelling' or 'substantial' necessity tests." Df.s' Mem. at 7. The court has devoted much time and thought to this question; after careful review of applicable Supreme Court precedent, the court is convinced that in order to show the State of Utah's interest in trying the plaintiff outweighs his liberty interest against the forcible administration of antipsychotic medication, defendants must show that "safety

considerations or other compelling concerns outweigh[ ] [plaintiff's] interest in freedom from unwanted antipsychotic drugs." *Riggins*, at ———-———, 112 S.Ct. at 1815–16.[13]

■ Initially, the court notes the general prescription that "[w]here certain 'fundamental rights' are involved, the Court has held that regulation limiting these rights may be justified only by a 'compelling state interest.'" *Roe v. Wade*, 410 U.S. 113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147 (1973). In the case of actions by prison officials, however, the Court has made clear that the state need show only that the action is "'reasonably related to legitimate penological interests.'" *Harper*, 494 U.S. at 223, 110 S.Ct. at 1037 (quoting *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261). The issue before this court is not like *Harper*, however, in which the purpose of the involuntary medication was to insure that the incarcerated person ceased to be a physical danger to himself or others. Rather, defendants do not seek to medicate plaintiff for the needs of the institution, but to render him competent to stand trial. Thus, the reduced standard of review applied by the Court in *Harper* is not appropriate in resolving this case.[14]

The Court's more recent opinion in *Riggins* provides support for the conclusion that *Harper* does not control this issue. In that case the Court stated that forced medication to render a defendant competent to stand

---

**12.** Defendants claim that it is "erroneous" to focus "on whether the reviewing court should impose a higher or more restrictive standard of review." Df.s' Mem. at 7. This assertion is not surprising in that the drawing of such a distinction likely will hamper the defendants' attempts to medicate the plaintiff against his will.

The court rejects this assertion; the court cannot simply ignore numerous Supreme Court cases holding that this court must evaluate conflicting constitutional interests in light of the appropriate standard of review. Where government action impacts a fundamental right, absent specific direction to the contrary (such as *Harper*), the court must require the government to show a compelling interest supporting its action. Perhaps this rule acts with greater force in no other situation than that presently facing the court. "The infliction of physical pain is final and irreparable; it cannot be undone in a subsequent proceeding." *Ingraham v. Wright*, 430 U.S. 651, 695, 97 S.Ct. 1401, 1425, 51 L.Ed.2d 711 (1977) (White, J., joined by Brennan, Marshall, and Stevens, JJ., dissenting).

**13.** The court rejects defendants' claim that *Youngberg* states the correct standard of review for this case. Not only is *Riggins* a more recent expression of the Court's opinion than *Youngberg*, but—unlike *Riggins* and this case—*Youngberg* "did not deal with decisions to administer or withhold medical treatment." *Cruzan*, 497 U.S. at 280, 110 S.Ct. at 2852. Moreover, simply that *Youngberg* addresses the rights of civilly committed patients does not indicate it controls this case. The proper constitutional standard inheres from the importance of the interest at stake and the nature of the state action affecting that interest in a particular case. In fact, a state's interest in rendering a defendant competent to stand trial was not at issue in *Youngberg*, and that opinion is silent on this issue.

**14.** This would be an altogether different case if defendants sought to forcibly medicate plaintiff to protect institutional needs. *Cf. Bell v. Wolfish*, 441 U.S. 520, 546, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979).

trial requires an "overriding justification and a determination of medical appropriateness." *Riggins*, —— U.S. at ——, 112 S.Ct. at 1815. The *Riggins* Court declined to adopt any particular standard of review beyond this statement because of the absence of necessary findings by the trial court. In his dissent, Justice Thomas accused the *Riggins* majority of adopting a standard of strict scrutiny. *Id.* at ——, 112 S.Ct. at 1826 (Thomas, J., dissenting). The majority disagreed, stating that "[c]ontrary to the dissent's understanding, we do not 'adopt a standard of strict scrutiny.'" *Id.* at ——, 112 S.Ct. at 1815 (majority opinion by Justice O'Conner). Rather, the Court felt *Riggins* provided "no occasion to finally prescribe such substantive standards...." *Id.* The majority did, however, note that

[a]lthough we have not had occasion to develop substantive standards for judging forced administration of such drugs in the trial or pretrial settings, Nevada certainly would have satisfied due process if the prosecution had demonstrated and the District Court had found that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Rig-

gins' own safety or the safety of others. Similarly, the State might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means.

*Id.*

■■■ This is the total of the *Riggins* Court's guidance on the issue. Significantly, however, the foregoing makes clear that the Court will not necessarily permit the involuntary medication of every pretrial detainee, even if less intrusive means are not available for achieving competency. *Riggins* also makes clear the trial court erred in not justifying the forcible administration of the medication with a finding that a "compelling" state interest outweighed the prisoner's liberty interest against such an action.[15] Given this discussion, it would be error for the court to allow the State of Utah to forcibly medicate the plaintiff unless the court find's the State's interest in so acting is "compelling."[16] Consequently, to forcibly medicate plaintiff under Revised Section 11 defendants must show a compelling interest supporting that section's application in this case.

---

15. This conclusion is also supported by Justice Kennedy's concurring opinion in *Riggins*. Justice Kennedy, the author of *Harper*, wrote separately to stress the constitutional limitations on forced medication. Emphasizing the potentially dangerous side effects of antipsychotic medication, Justice Kennedy wrote to express his view that "absent an extraordinary showing by the State, the Due Process Clause prohibits prosecuting officials from administering involuntary doses of antipsychotic medicines for purposes of rendering the accused competent for trial in most cases, and to express doubt that the showing can be made, given our present understanding of the properties of these drugs." *Riggins*, —— U.S. at ——, 112 S.Ct. at 1817 (Kennedy, J., concurring in the judgment). Justice Kennedy continued:

The avowed purpose of the medication is not functional competence, but competence to stand trial. In my view elementary protections against state intrusion require the State in every case to make a showing that there is no significant risk that the medication will impair or alter in any material way the defendant's capacity or willingness to react to the testimony at trial or to assist his counsel. Based on my understanding of the medical literature, I have substantial reservations that the State can make that showing. Indeed, the inquiry itself is elusive, for it assumes some baseline of

normality that experts may have some difficulty in establishing for a particular defendant. These uncertainties serve to underscore the difficult terrain the State must traverse when it enters this domain.

*Id.* at ——, 112 S.Ct. at 1818. As stated by Associate Judge Ferren of the District of Columbia Court of Appeals in his cogent analysis of *Riggins*, "[t]he fact that the six-member majority did not go further—absent 'briefing or argument,'—does not necessarily mean it would disagree with Justice Kennedy when addressing the substantive issue." *Khiem v. U.S.*, 612 A.2d 160, 177 (D.C.App.1992) (Ferren, J., dissenting from denial of petition for rehearing en banc) (citations omitted), *cert. denied*, —— U.S. ——, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).

16. The Court has stated:

The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under out system of criminal justice. Long ago this Court stated:

The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.

### 2. The State's Interest v. Plaintiff's Interest

The State of Utah's interest in trying the plaintiff is significant. In his concurring opinion in *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), Justice Brennan wrote:

> The safeguards that the Constitution accords to criminal defendants presuppose that government has a sovereign prerogative to put on trial those accused in good faith of violating valid laws. Constitutional power to bring an accused to trial is fundamental to a scheme of "ordered liberty" and prerequisite to social justice and peace.
>
> . . . . .
>
> [If a resolution of criminal charges] cannot be reached by judicial trial in a court of law, it will be reached elsewhere and by other means, and there will be grave danger that liberty, equality, and the order essential to both will be lost.

*Id.* at 347–48, 90 S.Ct. at 1063; *see also Winston v. Lee*, 470 U.S. 753, 762, 105 S.Ct. 1611, 1617, 84 L.Ed.2d 662 (1985) ("[T]he community's interest in fairly and accurately determining guilt or innocence ... is of course of great importance.").

■ In determining whether this "important" state interest outweighs's the plaintiff's interest, the Supreme Court has delineated several factors which the court must consider. First, the court must consider whether to a reasonable degree of medical certainty the treatment would render the plaintiff competent. *Cf. Harper*, 494 U.S. at 222–23, 110 S.Ct. at 1037–38. Second, in the context of an involuntary medication case, the *Riggins* Court stated that "the State might have been able to justify medically appropriate, involuntary treatment with the drug by establishing

that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means." —— U.S. at ——, 112 S.Ct. at 1815. Therefore, the court must consider whether the defendants have shown the State of Utah cannot obtain an adjudication of plaintiff's guilt or innocence using other means.

■ The Court pronounced other factors that are applicable to this case in *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). In that case the Court held that a compelled surgical intrusion into a defendant's body for evidence implicates expectations of privacy and security of such magnitude that the intrusion may be "unreasonable" even if likely to produce evidence of a crime. *Id.* at 759, 767, 105 S.Ct. at 1616, 1620. In reaching this conclusion the Court considered: (1) the extent to which the procedure may threaten the individual's safety or health; (2) the extent of intrusion on the individual's dignitary interests in personal privacy and bodily integrity; and (3) the community's interest in fairly and accurately determining guilt or innocence. *Id.* at 758–63, 105 S.Ct. at 1615–18. While in deciding *Winston* the Court relied primarily on the Fourth Amendment, which is not applicable in this case, the Court also analyzed "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity." *Id.* at 761, 105 S.Ct. at 1617. Thus, while not controlling, the factors listed in *Winston* are at least persuasive and the court finds them applicable to its analysis in this case.

### a. Have the Defendants Shown to a Reasonable Degree of Medical Certainty that Forcible Medication of Plaintiff is Likely to Render him Competent to Stand Trial?

■ The court finds that defendants have failed to show to a reasonable degree of

---

To implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt.

The actual impact of a particular practice on the judgment of jurors cannot always be fully determined. *But this Court has left no doubt*

*that the probability of deleterious side effects on fundamental rights calls for close judicial scrutiny.* Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience.

*Estelle v. Williams*, 425 U.S. 501, 503–04, 96 S.Ct. 1691, 1692–93, 48 L.Ed.2d 126 (1976) (emphasis supplied) (citations omitted).

medical certainty that forcible medication of plaintiff will render him competent to stand trial. At the hearing held on November 6, 1991, on plaintiff's motion for a preliminary injunction, Ms. Luinstra, defendants' attorney, admitted that defendants "don't know" whether "these drugs will make him competent so he can stand trial." Transcript of Preliminary Injunction Hearing, November 6, 1991 ("Inj.Hrn'g") at 9. This admission was supported by other testimony at the hearing. When plaintiff's counsel asked Dr. Philip Washburn, plaintiff's attending physician at the State Hospital, whether he expected "that these medications are going to make him competent," Dr. Washburn responded: "No, we cannot promise that. It's just a matter—we feel strongly that he deserves a right to treatment." *Id.* at 28.[17]

On this issue Dr. Hummel included the following in his affidavit: "Treatment with antipsychotic medications cannot be guaranteed to arrest or reverse the progress of mental deterioration caused by Dementia any more than antibiotics can be 'guaranteed' to cure a particular infection." Hummel Aff. ¶ 21, at 7. In fact, Dr. Rindflesh, who believes plaintiff suffers only from alcohol-related dementia, stated: "In my opinion, treatment of Mr. Woodland with psychotropic medications will be of little or no benefit; such treatment is not likely to improve his condition since his primary ... disorder is dementia which cannot be reversed by treatment with psychotropics." Rindflesh Aff. ¶ 11, at 2–3. Even Dr. Gardner, on whom this court primarily relies in finding that plaintiff is not competent to render an informed medical decision, believes only that "a trial of psychotropic medication *may* be appropriate...." Gardner Aff. ¶ 13, at 5 (emphasis supplied).

Of course, the court cannot expect defendants to "guarantee" or "promise" that their actions would render plaintiff competent to stand trial. Where, however, defendants

seek to support the forcible medication of plaintiff with the State's interest in rendering him competent to stand trial, there must be at least a showing that such a course of action can reasonably be expected to in fact render the plaintiff competent. On the record before the court, the undisputed facts compel the conclusion that there has been no such showing.

*b. The Extent to Which the Forcible Administration May Threaten Plaintiff's Health and Extent of Intrusion on Plaintiff's Privacy Interest*

 "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Riggins,* —— U.S. at ——, 112 S.Ct. at 1814.[18] This is peculiarly the case when the state wishes to force psychotropic drugs on an individual.

The purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes. While the therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects. One such side effect identified by the trial court is acute dystonia, a severe involuntary spasm of the upper body, tongue, throat, or eyes. The trial court found that it may be treated and reversed within a few minutes through the use of the medication Cogentin. Other side effects include akathesia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a relatively rare condition with can lead to death from cardiac dysfunction); and tardive dyskinesia, perhaps the most discussed side effect of antipsychotic drugs. Tardive dyskinesia is a neurological disorder, irreversible in some cases, that is characterized by involuntary, uncontrolla-

---

17. Surely the defendants' belief that plaintiff has a right to the forcible medication is not sufficient to overcome the plaintiff's liberty interest against that action.

18. Even the sole dissenting justice in *Riggins,* Justice Thomas, wrote: "I do not mean in any way to undervalue the importance of a person's

liberty interest in avoiding forced medication or to suggest that States may drug detainees at their whim. Under *Harper,* detainees have an interest in avoiding the unwanted medication that the States must respect." *Id.* at ——, 112 S.Ct. at 1826 (Thomas J., dissenting, joined by Scalia, J.).

ble movements of various muscles, especially around the face.... [T]he proportion of patients who exhibit the symptoms of tardive dyskinesia ranges from 10% to 25%.

*Harper*, 494 U.S. at 229–230, 110 S.Ct. at 1041; *see also* Hummel Aff. ¶ 23, at 8 ("Side effects, even serious ones, can occur in the early stages of medication administration.").[19] Given these potential side effects, the court finds that the forcible administration of psychotropic drugs presents a substantial intrusion on plaintiff's liberty interest and an extensive encroachment on plaintiff's bodily integrity.

### c. The Community's Interest in Fairly and Accurately Determining Plaintiff's Guilt or Innocence

■ While the State of Utah clearly has a significant interest in trying those accused of murder, for two reasons the court finds this interest does not outweigh the plaintiff's liberty interest in this case. First, the "side effects of antipsychotic drugs may alter demeanor in a way that will prejudice all facets of the [trial] defense." *Riggins*, —— U.S. at ——, 112 S.Ct. at 1819 (Kennedy, J., concurring in the judgment). Second, the court's conclusion that plaintiff cannot be forcibly medicated does not mean plaintiff will be released from confinement.

First, the side effects of psychotropic drugs may result in it being impossible for the State to "fairly and accurately" try plaintiff; and the State's interest is not in trying plaintiff under any circumstances, but in trying plaintiff fairly and accurately. "It is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, either while the accused is on the stand or sitting at the defense table." *Id.; see also Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973) (per curiam).

By administering medication, the State may be creating a prejudicial negative demeanor in the defendant—making him look nervous or restless, for example, or so calm or sedated as to appear bored, cold, unfeeling and unresponsive.... That such effects may be subtle does not make them any less real or potentially influential.

Brief for American Psychiatric Association at 13, *Riggins v. Nevada*, —— U.S. ——, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (cited by Kennedy, J., concurring in the judgment). If the plaintiff were to exhibit side effects as a result of his medication with psychotropic medication, significant and decisive prejudice could result that would render any trial unconstitutional. *Cf. Estelle v. Williams*, 425 U.S. 501, 504, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976) ("The actual impact of a particular practice on the judgment of jurors cannot always be fully determined."); *Coy v. Iowa*, 487 U.S. 1012, 1017, 108 S.Ct. 2798, 2801, 101 L.Ed.2d 857 (1988) ("there is something deep in human nature that regards face-to-face confrontation between accused and accuser as 'essential to a fair trial in a criminal prosecution'"). Medicating plaintiff with psychotropic medication might also interfere with plaintiff's right to cooperate with counsel in his defense. *Cf. Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). On these facts, there is not a sufficient connection between the State's interest in fairly trying plaintiff and the forcible use of antipsychotic medication.

The second reason the court feels the State's interest in trying plaintiff does not outweigh plaintiff's liberty interest is that this opinion will not result in plaintiff's release from the State Hospital. Plaintiff has been committed to the State Hospital pursuant to Utah Code Ann. § 77–15–6 (Supp. 1992) based on Judge Russon's conclusion that plaintiff is not competent to stand trial. Under that section, plaintiff will remain in the State Hospital "until the court that com-

---

19. In addition to psychotropic medication, the defendants seek to treat the plaintiff with lithium. The drug lithium is not an antipsychotic, but is an "antimania" medication that alters the sodium transport in nerve and muscle cells. *Physician's Desk Reference* 1844 (42 ed. 1988). Lithium reduces the frequency and intensity of manic episodes. *Id.* Lithium can result in side effects, including tremors, abdominal cramps, nausea, vomiting, diarrhea, unusual thirst, increased urine excretion, and fatigue. *Id.* at 1845.

mitted him ... finds that he is competent to proceed" to trial. *Id.* § 77–15–6(1).[20]

### d. Has the State Shown that it Cannot Obtain Adjudication of Guilt of Innocence with Less Intrusive Means?

On the undisputed facts the court finds that defendants have failed to show the State cannot obtain an adjudication of plaintiff's guilt or innocence with less intrusive means.[21] Dr. Hummel feels that "[w]ithout medication, the Plaintiff cannot be expected to have any chance of improvement and further deterioration is possible." Hummel Aff. ¶ 22, at 7. Likewise, Dr. Gardner stated "plaintiff is not competent at the present time (and without treatment will not likely be competent in the future)...." Gardner Aff. ¶ 17, at 6. With this statement, however, Dr. Gardner was not referring to plaintiff's competence to stand trial, but to plaintiff's ability "to understand the nature of his psychiatric problems and mental illness, the nature and purpose of any proposed treatment for his

illness, and to make a rational assessment and decision about the possible benefits and risks associated with any proposed treatment." *Id.* ¶ 17, at 6–7.

Thus, defendants' have brought forward no persuasive evidence showing that the State cannot obtain an adjudication of plaintiff's guilt or innocence absent the forcible administration of psychotropic medication. Rather, the evidence shows that plaintiff may never be competent to make an informed medical decision absent psychotropic medication; of course, defendants do not seek to forcibly medicate plaintiff so that he can render an informed medical decision, but to render him competent to stand trial.[22]

### e. The Court's Conclusion

On the specific facts of this case, the court finds the State's interest in trying plaintiff for murder is not sufficiently compelling to allow the forcible medication of plaintiff under Revised Section 11.[23]

20. The court is not unmindful of the defendants' argument that this result requires the State of Utah essentially to "warehouse" plaintiff in the State Hospital. Df.s' Mem. at 13. If, however, the State cannot render plaintiff competent to stand trial absent the forcible administration of antipsychotic drugs "in my view the Constitution requires that society bear this cost in order to preserve the integrity of the trial process." *Riggins*, —— U.S. at ——, 112 S.Ct. at 1820 (Kennedy, J., concurring in the judgment).

 As discussed herein, defendants overstate the results of such a decision. A finding that plaintiff presents a danger to himself or others would justify the forcible administration of the drugs. *See Harper*, 494 U.S. at 210, 110 S.Ct. at 1030. The defendants also have available to them the guardianship provisions of Utah law.

21. Without ruling on the matter, the court points out that having found the other factors so strongly in plaintiff's favor, even were the court to find in defendants' favor on this issue it would not necessarily allow the forcible administration of plaintiff. *Cf. Winston*, 470 U.S. at 760, 105 S.Ct. at 1616 ("In a given case, the question whether the community's need for evidence outweighs the substantial privacy interests at stake is a delicate one admitting of few categorical answers.").

22. The defendants have devoted much to their argument that a ruling in plaintiff's favor would intrude on the plaintiff's doctors' medical judgment. This argument, however, goes to a judicial review of the procedures used by a state to determine which of several alternate treatments

should be used in a given case—a question of procedural due process. As the defendants correctly state, a court should give due deference to a medical decision regarding the specific form of treatment. The issue before the court, is not whether plaintiff should be treated with one drug or another, however, but whether plaintiff can be treated at all.

23. Cases with seemingly contrary results are not persuasive. In *State v. Hardesty*, 139 Mich.App. 124, 362 N.W.2d 787 (1984), *app. dismissed*, 477 U.S. 902, 106 S.Ct. 3269, 91 L.Ed.2d 560 (1986), the court held that "an incompetent accused may be made competent through medicinal agents, and may be tried even though medication must be continued throughout trial to prevent the accused from again becoming incompetent." *Id.*, 362 N.W.2d at 794. The *Hardesty* court grounded this conclusion in its finding that

> the medication allowed the state to bring defendant to trial so that his culpability and criminal responsibility could be adjudicated. Additionally, the record clearly demonstrates that the drugs used enhanced, rather than diminished, defendant's ability to engage in rational thought and assist counsel at trial. This being the case, the balance of competing interests favors the state.

*Id.* at 793. The undisputed evidence before this court shows, however, that—unlike the medication used in *Hardesty*—psychotropic medication would hinder plaintiff's ability to obtain a fair trial. In fact, the *Hardesty* court distinguished its case from *State v. Maryott*, 6 Wash.

## D. Involuntary Medication Based on the State's Role as Parens Patriae

Defendants next claim the court should permit "the State to fulfill its obligation in its role as *parens patriae* for plaintiff to provide him with the course of medical treatment which is most appropriate for his condition and in his best interest." Df.s' Mem. at 14. Defendants have failed to support this assertion with citation to any case law or any evidence in the record. Given the importance of the interests affected by this case, however, it would be inappropriate to dismiss this claim on these grounds.

The State of Utah has a "legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves." *Addington v. Texas*, 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979). This interest cannot be viewed lightly, however; involuntary civil commitment to a mental institution is "a massive curtailment of liberty." *Vitek v. Jones*, 445 U.S. 480, 491–92, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980). In fact, "because it may be for an indefinite period of time, [civil commitment] can be a more intrusive use of the state's power than incarceration under the criminal code." *Colyar v. Third Judicial Dist. Ct.*, 469 F.Supp. 424, 429 (D.Utah 1979) (citing *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972)); *accord Project Release v. Prevost*, 722 F.2d 960, 971 (2d Cir.1983). Whether acting pursuant to its police power or parens patriae interest, the state "may not curtail or deny Fourteenth Amendment substantive or procedural due process protections in exercising such powers." *Project Release*, 722 F.2d at 971; *see also O'Connor v. Donaldson*, 422 U.S. 563, 580, 95 S.Ct. 2486, 2496, 45 L.Ed.2d 396 (1975); *Specht v. Patterson*, 386 U.S. 605, 608, 87 S.Ct. 1209, 1211, 18 L.Ed.2d 326 (1967). "Diminished capacity alone cannot serve to undermine protections afforded the individual's liberty interest in this area." *Project Release*, 722 F.2d at 971. The right of self-determination should not be lost merely because the individual is unable to sense a violation of it. *In re Conroy*, 98 N.J. 321, 486 A.2d 1209, 1229–33 (1985).

The court has held in this opinion that plaintiff is incompetent to make an informed medical decision; undoubtedly his cannot be the final word on the administration of the psychotropic medication. As Dr. Gardner stated: "[s]ome form of substituted judgment

App. 96, 492 P.2d 239 (1971), where the medication "tended to seriously erode [the defendant's] ability to assist in his defense." *Hardesty*, 362 N.W.2d at 793.

In *State v. Hayes*, 118 N.H. 458, 389 A.2d 1379 (1978), the Supreme Court of New Hampshire held that a trial court could compel a defendant to be under psychotropic medication at least four weeks prior to trial if the jury was instructed about the use of the medication and if at sometime during the trial the jury viewed the defendant without medication. *Id.* 389 A.2d at 1382. *Hayes* is distinguishable on both its facts and law. First, it is not clear from the opinion what standard of constitutional review the court used in reaching its decision. Second, and more significant, in *Hayes* the defendant had been taking psychotropic medication before he committed the crime, and the state presented evidence that he was under the influence of the medication when he committed the crime. *Id.* at 1380.

In *State v. Law*, 270 S.C. 664, 244 S.E.2d 302 (1978), the Supreme Court of South Carolina held: "It is our view that medication may be administered without the consent of a defendant under compelling circumstances, including those where the medication is necessary to render a defendant competent to stand trial." *Id.* 244 S.E.2d at 307. Not only did this conclusion

precede *Harper* and *Riggins*, which delineate the substantial nature of the right at issue, but the *Law* court also relied on evidence that "defense counsel impliedly consented to giving the medication." *Id.*

In *Khiem v. United States*, 612 A.2d 160 (D.C. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993), the court held that it was not error for a trial court to find that the prosecution had a fundamental interest in administering antipsychotic medication to a defendant so he could stand trial for murder. *Id.* at 167–68. The trial court relied on evidence that the defendant was dangerous and "might strike out against others," *id.* at 168 n. 11, that the defendant was attempting to have his commitment terminated, and that he would never be brought to trial without the treatment. *Id.* at 167–68. As the court repeatedly has stressed, the undisputed evidence shows that none of these facts is present in the instant case.

Finally, in *Williams v. Anderson*, 959 F.2d 1411 (7th Cir.1992), the court did not reach the issue whether forcible administration of the drug Haldol "would violate rights that are clearly established after *Washington*," but instead addressed issues of qualified immunity under § 1983 implicated by such forcible administration. *Id.* at 1414–17.

is therefore necessary." Gardner Aff. ¶ 17, at 7. Defendants assert that they, or more specifically the State Hospital, therefore must make this decision for plaintiff. In this regard, Drs. Hummel, Gardner, and Pederson all believe that administration of psychotropic medication is in plaintiff's medical best interest. Hummel Aff. ¶ 19, at 6; Gardner Aff. ¶ 13, at 5; Inj.Hrn'g at 18–20.

The court is not without guidance from the Supreme Court on the question of who should make a decision to accept or refuse treatment for an incompetent individual; the Court addressed this issue in *Cruzan v. Missouri Dept. of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). *Cruzan* concerned Nancy Cruzan, who was left incompetent and in a persistent vegetative state as a result of an automobile accident. Cruzan exhibited motor reflexes, but evidenced no indication of significant cognitive function. The State of Missouri was bearing the significant cost of her care. Cruzan's parents wished to terminate Nancy's artificial hydration and nutrition, but hospital officials refused as that would result in her death. A Missouri state trial court authorized the termination of medical procedures, finding that Nancy had a fundamental right under the State and Federal Constitutions to direct or refuse medical treatment. The trial court found that Nancy's pre-accident statement to a housemate that she would not wish to continue to live if injured unless she could "live at least halfway normally" showed that she would not wish to live with artificial hydration and nutrition. The Missouri Supreme Court reversed, holding, *inter alia,* that Nancy's statement to her housemate

was insufficient to determine her intent. Based on the Missouri living will statute, the court held that Nancy's intent must be established by clear and convincing evidence. The court also rejected the argument that Nancy's parents were entitled to order the cessation of medical care. On appeal, the Supreme Court defined the issue before it as whether the United States Constitution prohibited Missouri from requiring that evidence of an incompetent's wishes as to the withdrawal of life-sustaining treatment be proved by clear and convincing evidence. *Id.* at 269, 110 S.Ct. at 2846. While not directly on point, the Court's analysis in *Cruzan* of who should make a decision for an incompetent person is applicable to this case.

■ While it is clear that in most circumstances a competent person makes the decision for himself whether to accept or reject medical treatment, defendants claim the State must make that decision for an incompetent person. The court rejects this claim.[24] In *Cruzan,* the Court stated "we do not think the Due Process Clause requires the State to repose judgment on these matters with anyone but the patient herself." *Id.* at 286, 110 S.Ct. at 2855. Thus, while, as with Nancy's parents in *Cruzan,* the court has no doubt that defendants are concerned with plaintiff's best interests, the court holds that this decision must repose in plaintiff himself. In *Cruzan* the State of Missouri accomplished this by following its own living will statute that required a showing of Nancy's intent by clear and convincing evidence. Here, the State of Utah must do likewise by

24. In arguing against such a conclusion, the defendants assert:

> If the Court is willing to enforce the subjective objection to treatment of a patient who has been found professionally and judicially to be incompetent ... [w]ould this also mean that plaintiff could refuse an emergency appendectomy? Or should he be permitted to drink Drano on a regular basis if he is convinced it will cure his gout? And, if so, are the defendants then liable in a suit brought on plaintiff's behalf for not requiring the emergency treatment or not stopping him from using Drano? Df.s' Mem. at 12–13 & n. 2. While the court is loathe to debate hypothetical situations with counsel, it is worthwhile to note the differences between the hypotheticals presented by the de-

fendants' counsel and the facts before the court. In the hypotheticals, the plaintiff clearly would present a danger to himself or others; either by refusing an emergency appendectomy, and thereby risking death, or by ingesting Drano on a regular basis. The defendants have failed, however, to present any evidence that plaintiff has acted in a manner harmful to himself or others since his commitment by Judge Russon. In fact, only after reaching this same conclusion did defendants modify Section 11 to allow for plaintiff's forcible medication absent any evidence of dangerousness. Forcible medication of a pretrial detainee in an emergency situation or who presents a danger to himself or others presents a fundamentally (and constitutionally) different question than that before the court.

following its own laws on substituted judgment and appoint a guardian to protect plaintiff's interests. The State of Utah cannot merely assert its parens patriae interest and ignore plaintiff's significant liberty interest in the unwanted administration of antipsychotic medication. As the Court stated in *Cruzan:* "An incompetent person is not able to make an informed and voluntary choice to exercise a hypothetical right to refuse treatment or any other right. Such a 'right' must be exercised for her, if at all, by some sort of surrogate." *Id.* at 280, 110 S.Ct. at 2852. If the State of Utah wishes to exercise substituted judgment for plaintiff, it cannot do so merely by showing that psychotropic medication is in plaintiff's medical best interest. Rather the State must proceed according to the its own laws for the appointment of a guardian for incompetent persons.[25] Such a procedure provides sufficient protection of all significant interests involved. *Cf. Cruzan,* 497 U.S. at 283–85, 110 S.Ct. at 2854–55.[26]

The court finds support for this conclusion in several leading decisions from other courts. For example, the Supreme Judicial Court of Massachusetts reached the same conclusion in *In re Roe,* 383 Mass. 415, 421 N.E.2d 40 (1981). In *Roe* the court considered under what circumstances a ward could exercise the right to refuse medical treatment where the ward was incapable of exercising the right personally because of incompetence. In language particularly appropriate to this case, the court stated:

The question presented by the ward's refusal of antipsychotic drugs is only incidentally a medical question. Absent an overwhelming State interest, a competent individual has the right to refuse such treatment. To deny this right to persons who are incapable of exercising it personally is to degrade those whose disabilities make them wholly reliant on other, more fortunate, individuals. In order to accord proper respect to this basic right of all individuals, we feel that if an incompetent individual refuses antipsychotic drugs, those charged with his protection must seek a judicial determination of substituted judgment. No medical expertise is required in such an inquiry, although medical advice and opinion is to be used for the same purposes and sought to the same extent that the incompetent individual would, if he were competent. We emphasize that the determination is *not* what is medically in the ward's best interest—a determination better left to those with extensive medical training and experience. The determination of what the incompetent individual would do if competent will probe the incompetent individual's values and preferences. . . .

*Id.* 421 N.E.2d at 51–52. The Supreme Court of New Jersey reached the same conclusion in *In re Quinlan,* 70 N.J. 10, 355 A.2d 647 (1976). In that famous case, the court noted that the "only practical way" to prevent an incompetent's loss of the right to privacy is to allow the incompetent's guardian to exercise that right on her behalf. *Id.* 355 A.2d at 664; *accord In re Willis,* 74 Ohio App.3d 554, 599 N.E.2d 745, 748 (1991) ("it is

**25.** While the question of who should be appointed plaintiff's guardian is a question of state law properly resolved in state court, the court notes that defendants cannot serve in that capacity. Defendants have asserted interests that likely conflict with plaintiff's interests. Defendants have not argued, much less established, that they have considered what plaintiff's decision would be regarding the medication if he were competent. As the Supreme Court recognized in *Cruzan,* when dealing with an incompetent individual, the question is not what is objectively medically proper, but what decision the incompetent individual would make if that person were able to render the decision.

Any other rule, including that advanced by defendants, would result in an incompetent individual losing the protected and substantial liberty interest in being free from unwanted medication.

To allow defendants to make this decision based only on plaintiff's medical best interest is to allow a significant liberty interest to be overcome only on a showing of reasonableness, an outcome the Supreme Court has countenanced only where the incompetent person is found to be dangerous. *Cf. Bradshaw v. Idaho,* 120 Idaho 429, 816 P.2d 986, 990 (1991) (state must show by clear and convincing evidence that guardian should be appointed "to make treatment decisions for a patient who lacks the capacity to make informed decisions about treatment").

**26.** An Ohio state court recently approved a guardian's decision to administer psychotropic medication to an incompetent individual. *In re Willis,* 74 Ohio App.3d 554, 599 N.E.2d 745, 748 (1991).

in appellant's best interest to have a guardian appointed with the power to authorize the forced administration of psychotropic drugs").[27]

### E. Involuntary Medication to Protect Plaintiff's Interest to Function in the Least Restrictive Environment

Defendants' have failed to delineate the basis for this assertion; in fact, defendants have cited no legal precedent or evidence in the record to support this claim. The court's careful review of the record has found no persuasive evidence that psychotropic medication would allow plaintiff to function in the least restrictive environment, much less that the State's interest in so acting is compelling. The court cannot find that plaintiff's liberty interest is outweighed by a particular state interest on the absence of a record.

### F. The Constitutionality of Revised Section 11 in this Case

The Revised Section 11 provides:

The Committee shall order involuntary treatment with medication if, upon comple-

tion of the hearing and consideration of the record, the Committee finds, by majority vote, the following conditions to exist:

3.9.1 The proposed medical treatment is in the medical best interest of the patient, taking into account the possible side effects of the treatment as well as the potential benefits of the treatment, and

3.9.2 The proposed medical treatment is in accordance with prevailing standards of accepted medical practice.

Revised Section 11 ¶ 3.9.

▮▮▮ Based on the discussion in this opinion of the interests asserted by defendants to support the forcible administration of antipsychotic medication under this section, such an action would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. First, the section does not require a finding that plaintiff is dangerous to himself, other, or property, in which case *Harper* would allow such a procedure.[28] Second, there is no compelling inter-

---

**27.** Contrary to defendants' assertions, the United States Court of Appeals for the Fourth Circuit's decision in *United States v. Charters*, 863 F.2d 302 (4th Cir.1988) (en banc), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990), is not to the contrary. In *Charters*, a case addressing questions of procedural due process not reached here, the Fourth Circuit held that a "base-line" decision to forcibly medicate an incompetent psychiatric patient should be made by appropriate medical personnel, subject to judicial review to guard against arbitrariness. The court already had determined the patient was a "present public danger," thereby resolving the substantive due process question in favor of the state. No doubt this led the Supreme Court to deny certiorari in *Charters* shortly after it issued its *Harper* decision.

The Fourth Circuit thus approached its decision in *Charters* on very different facts than the instant case: the incompetent patient in *Charters* had been found to present a danger to others. *Id.* at 304. This court makes clear, as did the Supreme Judicial Court in *Roe*, that this opinion does not concern the procedural safeguards used by the State of Utah to ensure that a medical decision in a particular case is appropriate. Had plaintiff been found to present a danger to himself, others, or property, the procedural due process question could be resolved by reference to *Harper* and *Charters*.

**28.** Based on this court's discussion of *Harper* and *Riggins*, the application of the Revised Section 11

in this case would be constitutional only if the State establishes that its actions are supported by a compelling or other significant interest. Given this standard, absent a finding that a patient is dangerous, therefore implicating *Harper's* relaxed standard, the court has serious questions whether Revised Section 11 ever can be constitutionally applied.

Defendants also have cited Utah Code Ann. § 62A–12–234.1 (Supp.1992) as evidence of the State's strong interests in forcibly medicating the plaintiff. That section authorizes the State Hospital to forcibly medicate a patient if: (1) a court has determined that "the patient lacks the ability to engage in a rational decision-making process regarding the acceptance of medical treatment;" (2) "the proposed treatment is in the medical best interest of the patient;" and (3) "the proposed treatment is in accordance with prevailing standards of accepted medical practice." *Id.* § 62A–12–234.1(2). As the defendants point out, this section does not require a finding of dangerousness before a patient is forcibly medicated.

Section 62A–12–234.1 was enacted in 1992, however, after the commencement of this litigation. *See* 1992 Utah Laws ch. 231, § 10 (codified at Utah Code Ann. § 62A–12–234.1 (Supp. 1992)). There is no evidence before the court that this statute played any role whatsoever in defendants' decision to forcibly medicate plaintiff. Accordingly, there is no justiciable "case or controversy" before the court regarding section 62A–12–234.1, and the court makes no ruling

est supporting the State's attempt to forcibly medicate plaintiff pursuant to this section to render plaintiff competent to stand trial. Third, it would be inconsistent with the Due Process Clause to medicate plaintiff pursuant to Revised Section 11 in furtherance of the State's parens patriae interest; rather, the State must follow its own laws regarding the exercise of substituted judgment for incompetent individuals. The State must follow the same course of action in evaluating plaintiff's interest in operating in the least restrictive environment.

## V. CONCLUSION

For the foregoing reasons, and good cause appearing, IT IS HEREBY ORDERED as follows:

1. Plaintiff's Motion for Summary Judgment is granted consistent with the terms of this Memorandum Decision and Order. Defendants' Cross–Motion for Summary Judgment likewise is denied.

2. The Revised Section 11 is declared invalid as applied in this case as violative of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

regarding that section. *See United States v. Fruehauf,* 365 U.S. 146, 157, 81 S.Ct. 547, 554, 5 L.Ed.2d 476 (1961) ("Advance expressions of legal judgment upon issues which remain unfocused" are impermissible.).